**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PLAINTIFF ADELE VARGA,<br>Individually and On Behalf of<br>All Others Similarly Situated<br><br>                    Plaintiff,<br><br>          v.<br><br>GENERAL ELECTRIC COMPANY and<br>JEFFREY ROBERT IMMELT,<br><br>                    Defendants. | )<br>)  Civil Action No.   1:18-cv-1449 (GLS/DJS)<br>)<br>)  **CLASS ACTION COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Table of Contents

INTRODUCTION ................................................................................................... 1

OVERVIEW OF THE ACTION ........................................................................... 1

PARTIES, JURISDICTION AND VENUE ......................................................... 3

FACTUAL ALLEGATIONS ................................................................................ 3

    A. The Plan and Plan Fiduciaries................................................................... 3

    B. GE's Insurance Subsidiaries. ..................................................................... 5

    C. The 2006 ERISA Litigation: Defendants Deny Certain Plan Participants' Allegations that GE Inflated its Stock Price by Under Reserving its Insurance Liabilities. ......................... 8

    D. The Plan Participants' 2006 Allegations were Correct: In 2018, GE Admits that it Under Reserved its Insurance Liabilities by $15 Billion, and the GE Stock Price Fell. ............. 11

    E. Alternative Actions that Defendants Could Have Taken.................................................. 13

        i. Public disclosure to correct Defendants' previous communications to Plan Participants about their benefits..................................... 13

        ii. Eliminate the GE Stock Fund as an option for new contributions............................. 19

    F. Defendants' Were Also Hopelessly Conflicted and Their Conduct is Consistent with Their Other Proven Sharp Accounting Practices. ............................ 20

    G. Plaintiff's Experience.................................................................................. 23

CLASS ACTION ALLEGATIONS ...................................................................... 24

CLAIMS FOR RELIEF ........................................................................................ 25

    Count I: Breach of Fiduciary Duty – Duty of Prudence......................................... 25

    Count II: Breach of Fiduciary Duty – Duty of Loyalty ......................................... 26

PRAYER FOR RELIEF ....................................................................................... 28

**INTRODUCTION**

Plaintiff Adele Varga, on behalf of the GE Retirement Savings Plan (the "Plan"), herself, and a class of similarly situated participants and beneficiaries of the Plan (the "Participants"), brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*., ("ERISA") against the Defendants, and alleges the following upon personal knowledge as to her own acts, and upon information and belief as to all other matters, based upon the investigation made by her attorneys and expert consultants:

**OVERVIEW OF THE ACTION**

1.     For years, General Electric improperly manipulated its earnings and inflated its stock price by improperly under reserving for the insurance liabilities of its wholly-owned insurance subsidiaries.

2.     For years, the Plan offered a GE Stock Fund as one of the options that Plan participants could choose to invest their 401K retirement contributions and any matching funds. The GE Stock Fund invests essentially all of its assets in GE common stock.

3.     Defendants are Plan fiduciaries who either knew or should have known that the under reserving of GE's insurance liabilities had improperly manipulated GE's earnings and inflated the price of GE's common stock and, thus, the price of the GE Stock Fund. Defendants also had the authority to disclose and correct the problem.

4.     Indeed, in 2006 certain Plan participants brought ERISA class action lawsuits alleging that Defendants breached their fiduciary duties by continuing to offer the GE Stock Fund as an investment option even though they knew that the value was inflated by GE improperly under reserving for the insurance liabilities by $5 billion to $10 billion.

5.     Defendants denied the Plan participants' allegations and settled the case in 2009 before motions to dismiss were decided or discovery occurred. Upon information and belief, Defendant GE included an express denial of the Plan participants' allegations in, *inter alia*, a notice sent to every Plan participant.

6.      As a result, Plaintiff and putative class members, believing that GE's publicly traded stock price reflected the company's financial strength and the GE Stock Fund was a prudent investment option, continued to save for retirements by investing their contributions and matching funds in the GE Stock Fund. For example, in 2016 Plaintiff shifted her retirement contributions into the GE Stock Fund and directed that a portion of her subsequent contributions and matching funds be invested in the GE Stock Fund.

7.      Defendants' prior statements to Plan participants denying that the GE Stock Fund was overvalued because GE had artificially inflated the value of its common stock by improperly under reserving for the insurance liabilities turned out to be false and misleading.

8.      On January 16, 2018, GE announced that it had under reserved for the insurance liabilities of its two insurance subsidiaries by approximately $15 billion, and that it needed to contribute approximately $15 billion to its insurance subsidiaries, all of which had a materially negative impact on earnings.

9.      Shortly thereafter, GE also announced that the SEC was investigating the $15 billion shortfall.

10.     The value of GE common stock dropped on the news and has continued moving downward as GE has disclosed even more financial problems. In August 2009, GE's common stock traded at roughly $14 per share and then steadily rose from August 2009 to June 2017, reaching a high in July 2016 of nearly $33 per share. Today, GE's common stock trades below $8 per share.

11.     Defendants either were aware of this multi-billion-dollar shortfall despite their previous public denials to Plan participants or would have learned of the problem had they complied with their fiduciary duty under ERISA to investigate the Plan participants' allegations.

12.     Yet Defendants did nothing to correct their earlier false and misleading statements to Plan participants and took no other action to protect Plan participants, thereby breaching their fiduciary duties of prudence and loyalty and causing tremendous financial harm to the Plan and Plaintiff's and the putative class's retirement benefits.

2

## PARTIES, JURISDICTION AND VENUE

13.     Plaintiff Adele Varga is a Participant in the GE Retirement Savings Plan who has bought and held the GE Stock Fund in her retirement account.

14.     Defendant GE is a corporation organized under the laws of the State of New York that, according to its SEC filings, has an address at 1 River Road, Schenectady, NY 12345.

15.     Defendant Jeffrey Immelt was Chief Executive Officer ("CEO") and Chairman of the Board of GE from 2001 until 2017 who, upon information and belief, resides in the United States.

16.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a), and thus this Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdiction statute for civil actions arising under the laws of the United States under 28 U.S.C. § 1331.

17.     Defendants reside in the United States and, therefore, this Court has personal jurisdiction over it pursuant to 29 U.S.C. § 1132(e)(2).  Personal jurisdiction also exists pursuant to Fed. R. Civ. P. 4(k)(1)(A), because Defendants would be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

18.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2), because GE is located in this District, GE administers the Plan in this District, and some or all of the Defendants' breaches of fiduciary duty may have taken place in this District.

## FACTUAL ALLEGATIONS

### A.     The Plan and Plan Fiduciaries.

19.     The GE Retirement Savings Plan (the "Plan"), formerly known as the GE Savings and Security Program, is an "employee pension benefit plan" and a "defined contribution plan" within the meaning of 29 U.S.C. §§ 1002(2)(a) & (34), and is what is commonly referred to as a 401(K) plan.  The Plan is neither a defendant nor a plaintiff.

20.     The Plan allows Participants to invest a certain amount of their eligible earnings, and any employer matching contributions, in one or more investment options.

21.     A Participant's investment options are limited to the options made available in the Plan.  Therefore, Defendant GE's and the Board of Director's selection of investment options is crucial in helping a Participant save for retirement.

22.     One of the Plan investment options is the General Electric Common Stock Fund (the "GE Stock Fund") that invests at least 98% of its assets in GE common stock.

23.     A Participant who directs contributions and any matching funds to the GE Stock Fund does not own GE common stock. Instead, a Participant's proportional interest in the GE Stock Fund is measured in stock fund units. The Plan trust, using Participant contributions, purchases the appropriate amount of GE common stock from GE, and the Plan trust owns the GE common stock.

24.     Any GE common stock a Plan trust needs to sell is sold to GE at the fair market value of the GE common stock at the time of the sale or, if GE elects to not repurchase the shares, on the open market.

25.     Plaintiff Varga is a participant in the Plan who has regularly invested in the GE Stock Fund since at least 2016, and continues to hold these investments in her 401k plan. Under the terms of the Plan, Plaintiff is fully vested in her employee contributions and matching contributions.

26.     Based on the most recent Form 5500 filed with the DOL, as of the end of 2017, the Plan had over 223,000 participants.

27.     Defendant GE is the Plan sponsor and administrator who, under the terms of the Plan, has authority over the control and management of the operation and administration of the Plan.  As the Plan administrator with discretion to administer, control, and manage the Plan's investment options, GE is a fiduciary under 29 U.S.C. § 1002(21)(A).

28.     The Plan expressly provides that GE's Board of Directors has discretionary authority to amend, suspend or terminate the Plan at any time, or from time to time. Accordingly,

4

the GE Board of Directors, including the Chairman of the Board of Directors, Defendant Immelt, are fiduciaries under 29 U.S.C. § 1002(21)(A).

29.     Defendant Immelt is also a fiduciary under 29 U.S.C. § 1002(21)(A) because, upon information and belief, under the Plan terms in effect in 2009, the Board of Directors could delegate to Defendant Immelt as Chief Executive Officer the authority to amend any provision of Plan, provided the amendment is of an administrative nature *or* does not result in any material increase in GE's cost.

30.     ERISA requires a fiduciary, such as Defendants, to "discharge his duties with respect to a plan *solely* in the interest of [its] participants and beneficiaries," and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B).

31.     In addition, under ERISA a fiduciary has a continuing duty to monitor Plan investments and remove imprudent ones.

32.     As alleged herein, GE breached its fiduciary duties when it allowed Plaintiff and putative class members to invest in the inflated GE Stock Fund. Indeed, GE common stock fell in price within hours of GE initially publicly disclosing issues with the insurance subsidiaries in mid-2017 and has continued its downward trend since then.

**B.     GE's Insurance Subsidiaries.**

33.     GE owns and controls two insurance companies, Employers Reassurance Corporation (hereinafter "Employers Re") and Union Fidelity Life Insurance Company (hereinafter "Union Fidelity").  GE's control of both wholly-owned insurance entities is maintained through stock ownership, as reflected in the following:



34.     Although GE refers to its insurance business as "North American Life & Health," upon information and belief no such insurance entity exists, and GE is referring to its wholly-owned insurance subsidiaries, Employers Re and Union Fidelity.

35.     Both Employers Re and Union Fidelity reinsure large blocks of long-term care business. According to GE, long-term care represents approximately 60% of the combined companies' insurance liabilities, structured settlement annuities represent approximately 35% of the combined companies' insurance liabilities, and the remaining 5% being life reinsurance and other liabilities.

36.     For example, as of 2017, Employers Re had reinsured long-term care insurance liabilities for which it recorded a reserve liability of $8.1 billion. In other words, Employer Re reported that the present-day value of the future long-term care liabilities it reinsured was $8.1 billion.

37.     As of 2017, Union Fidelity had reinsured long-term care insurance liabilities from Genworth Life Insurance Company and Genworth Life Insurance Company of New York for which it recorded a reserve liability of $5.2 billion. Union Fidelity entered into the reinsurance contracts with these Genworth entities in 2004.

6

38.     Both Genworth Life Insurance Company and Genworth Life Insurance Company of New York are subsidiaries of Genworth Financial, Inc. All three of these Genworth entities were wholly-owned subsidiaries of GE until 2004, when GE sold 30% of its shares of Genworth Financial, Inc.'s stock to the public. Upon information and belief, GE sold its remaining Genworth Financial shares by 2006.

39.     GE received approximately $13 billion from the sale of Genworth Financial.

40.     GE maintained that Genworth Financial was a profitable business, but it was selling the company because the capital needed to reserve against insurance liabilities was conservatively invested and offered a lower return on equity than other financial businesses. GE stated that it intended to use the proceeds from the sale of Genworth Financial "to invest in growth initiatives and reduce 'parent-support debt' at GE Capital."[1]  Or, as Defendant Immelt said, "it's going to give us, as we go through 2004 and 2005, even more firepower to spend on growing the company."[2]

41.     After the sale, GE maintained that Employers Re and Union Fidelity were both adequately capitalized to meet their liabilities, and from 2004 to 2016 both insurance companies filed sworn Annual Statements stating that they were solvent and had adequate surplus to cover their liabilities and pay policyholders.

42.     An Annual Statement is a detailed statement of an insurance company's finances prepared in accordance with the rules of statutory accounting for insurance companies.

43.     Statutory accounting is solvency orientated and looks to surplus, which is derived by comparing the company's admitted assets to all of its liabilities, including its current and projected future insurance liabilities. Insurance companies may not include capital maintenance agreements or financial guarantees from an affiliated entity in its admitted assets. In addition, even though an insurer may be part of a holding company system, the surplus (and solvency) of each insurance company is determined solely by that company's finances independent of the

---

[1] GE Form 8K, dated November 18, 2003.
[2] https://www.bloomberg.com/news/articles/2004-05-30/the-ge-spin-off-you-never-heard-of

finances, or any agreements or financial guarantees, of any other affiliated company within the holding company system.

44.      Thus, when Employers Re reported a surplus of approximately $1.2 billion in its 2013 Annual Statement, it was representing that the value of its admitted assets exceeded the value of all its liabilities, including its insurance liabilities, by $1.2 billion regardless of any capital maintenance agreements or financial guarantees.

45.      When Union Fidelity reported a surplus of approximately $566 million in its 2013 Annual Statement, it was representing that the value of its admitted assets exceeded the value of all its liabilities, including its insurance liabilities, by $566 million regardless of any capital maintenance agreements or financial guarantees.

**C.   The 2006 ERISA Litigation: Defendants Deny Certain Plan Participants' Allegations that GE Inflated its Stock Price by Under Reserving its Insurance Liabilities.**

46.      In 2006 certain Plan participants brought ERISA class action lawsuits alleging that Defendants here, and other Plan fiduciaries, had breached their fiduciary duties under ERISA by continuing to offer the GE Stock Fund even though they knew it was an imprudent investment because GE was inflating its earnings and stock price by under reserving for its insurance liabilities by at least $5 billion to $10 billion.

47.      For example, the consolidated class action complaint made the following allegations:

(a)      "in excess of $16 billion of the Plan's $24.7 billion or more in [Plan] assets were invested in GE Stock" in 2005. *See* Consolidated Complaint, Doc. 34, ¶ 1 (*In Re General Electric Company ERISA Litigation*, Case No. No. 06-CV-315 (N.D.N.Y.).

(b)      "This investment strategy proved to be disastrous and continues to be so. During the Class Period, the price of Company Stock has already declined by approximately fifty percent and is in jeopardy of further

8

decline. Information emerged publicly on November 18, 2005 concerning material facts necessary to partially understand the reasons for the significant decline; the negative impact of the under-reserving at [Employers Re] on GE, GE Stock and/or Plan assets. This has caused hundreds of millions of dollars, if not billions of dollars, in losses to the Plan. *Moreover, there is additional information regarding GE's continued under-reserving practices which remain undisclosed to participants, which will cause additional losses to the Plan*." (*Id.*, ¶ 146; emphasis added.)

(c)     "During the Class Period and continuing to the present, GE misstated its earnings through material under-reserving in its insurance division…. The Life and Health lines of GE's insurance business, which were not sold to Swiss Re, continue to be materially under-reserved by at least $5 billion and as much as $10 billion." (*Id.*, ¶ 150.)

(d)     "GE influences its reserves in a number of other ways. One of the ways it chooses to do so is through the manipulation of actuarial assumptions used in the reserve calculations." (*Id.*, ¶ 155.)

(e)     Unreasonable assumptions have caused "the structured settlement annuity portfolio to be materially under-reserved by approximately $1 billion to $1.5 billion. This was done under pressure from GE management in order for GE to hit its Finance Plan despite the fact that the portfolio was under reserved." (*Id.*, ¶ 191.)

(f)     "[T]he [Union Fidelity Long-Term Care] portfolio is materially under-reserved…. by at least $2.5 billion." (*Id.*, ¶¶ 194-95.)

(g)     "the [accident and health] portfolio is under-reserved by at least $1 billion because of errors in the calculation of the reserves." (*Id.*, ¶ 198.)

9

(h)     "there are other insurance lines of business within GE that are materially under-reserved, including without limitation, certain term and whole life insurance lines purchased from American United Life and group disability. Upon information and belief, those lines of business are under-reserved by as much as $5 billion." (*Id.*, ¶ 199.)

48.     The defendant-fiduciaries in that case, including the Defendant-fiduciaries here, made public and unequivocal blanket denials of these Plan participants' allegations. For example:

(a)     "Defendants deny these allegations." *See* Defendants' Memorandum of Law in Support of their First Motion to Dismiss the Entire Complaint for Failure to State a Claim, Doc. 45-2 at p.1-2 (*In Re General Electric Company ERISA Litigation*, Case No. No. 06-CV-315 (N.D.N.Y.).

(b)     "Defendants denied and continue to deny all of the allegations made in the Complaint." *See* Class Action Settlement Agreement, Doc. 97-4 at p. 1 (*In Re General Electric Company ERISA Litigation*, Case No. No. 06-CV-315 (N.D.N.Y.).

(c)     "Defendants specifically deny any such liability or wrongdoing." *Id.* at p. 17.

(d)     "GE and the other Defendants deny the Named Plaintiffs' claims…." Notice of Proposed Settlement to Class, Doc. 97-6 at 3 (*In Re General Electric Company ERISA Litigation*, Case No. No. 06-CV-315 (N.D.N.Y.).

49.     Upon information and belief, the Notice of Proposed Settlement to Class with Defendants' denials of the Plan Participant's allegations was sent to all Plan participants.

50.     Defendants settled with the Plan participants in 2009. As reflected in the previous allegations, Defendants expressly denied all of those Plan participants' allegations as part of that

10

settlement, although GE did agree to make certain so-called "structural" changes to the Plan that, among other things, offered additional investment options, as well as to pay approximately $10 million to former Plan participants and $10 million in attorney fees.

**D.     The Plan Participants' 2006 Allegations were Correct: In 2018, GE Admits that it Under Reserved its Insurance Liabilities by $15 Billion, and the GE Stock Price Fell.**

51.     From at least 2004 to 2016, Defendants maintained that the admitted assets of both Employers Re and Union Fidelity exceeded their respective liabilities, including their insurance liabilities, and each entity reported surpluses.

52.     By mid-2017, however, GE started slowing leaking information implying that it may have financial problems at its insurance subsidiaries.

53.     In a July 2017 earnings call, for example, GE's CFO Jeff Bornstein announced "We recently have had adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium returns. We will update you in the fourth quarter."[3] Following this announcement, GE's share price fell 2.92%, to close at $25.91 on July 21, 2017, causing GE to lose close to $6.8 billion in market capital.

54.     These announcements coincided with a change in the leadership at GE. Defendant Immelt was slated to retire in December 2017; in October, however, GE announced that he would resign his post as chairman ahead of schedule in October 2017.

55.     Hinting at a history of questionable bookkeeping under Defendant Immelt's tenure, in November 2017 new CEO John Flannery announced, "we've been paying a dividend in excess of our free cash flow for a number of years now," and that the "dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow in the next couple of years . . . ."[4]

---

[3] General Electric's (GE) CEO Jeff Immelt on Q2 2017 Results – Earnings Call Transcript (Jul. 21, 2017), *available at* https://seekingalpha.com/article/4089530-general-electrics-ge-ceo-jeff-immelt-q2-2017-results-earnings-call-transcript?part=single.

[4] GE – General Electric Co Investor Update, at page 7, Thomson Reuters Streetevents (Nov. 13, 2017), available at https://www.ge.com/investor-relations/sites/default/files/GE-USQ_Transcript_2017-11-13.pdf.

56.     On January 16, 2018, GE unexpectedly announced that Employers Re's and Union Fidelity's reserve liabilities were $15 billion more than previously reported – a more than 50% increase of the $28 billion in combined liabilities these entities reported in 2016 – and thus the admitted assets of both insurance entities were insufficient to meet their insurance liabilities. In short, Employers Re and Union Fidelity each were insolvent by billions of dollars

57.     According to GE, the $15 billion increase in reserve liabilities is predominately related to Employer Re's and Union Fidelity's reserve liabilities for the blocks long-term care business they reinsured.

58.     While GE planned to provide the insurance entities with the capital necessary to make them solvent, statutory accounting required GE to immediately contribute the least $11 billion to fund the reserve liabilities, which GE apparently did not want to do.

59.     Thus, GE requested and then received permission from the Kansas Insurance Department, the primary regulator for both insurance entities, to depart from accepted statutory accounting practices and delay full recognition of the at least $11 billion in "additional actuarial reserves" over the years 2017 through 2023.

60.     As a result, GE caused GE Capital US Holdings ("GE Capital") to contribute $3.5 billion to the insurance entities at the end of 2017 – $2.5 billion for Employers Re and $1 billion to Union Fidelity – and plans to have GE Capital make billions in additional capital contributions in subsequent years to prop up both companies.

61.     GE's unexpected announcement that it had approximately $15 billion in unfunded insurance liabilities shocked the market. In June 2017, GE's stock price sat at nearly $30 per share.  However, by January 2018, it had dropped by 40%.

62.     To make matters worse, in January 2018, Defendant GE also revealed that it had "been notified by the S.E.C. that they are investigating the process leading to the insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls

for long-term service agreements." Q4 2017 General Electric Co Earnings Call Transcript, Thomson Reuters (Jan. 24, 2018).[5]

63.     From January 2018, until the present, GE's stock price has fallen from $18 per share to roughly $7 per share.

**E.      Alternative Actions that Defendants Could Have Taken.**

64.     There were at least two alternative actions available to Defendants to protect Plan Participants that would have been consistent with their fiduciary duties and the securities laws.

**i.      <u>Public disclosure to correct Defendants' previous communications to Plan Participants about their benefits.</u>**

65.     By the close of 2009, or thereafter, Defendants could have disclosed the problems with the under reserved insurance liabilities in its quarterly or annual SEC filings and, at the same time, disclosed that information to Participants.

66.     Indeed, upon receiving certain Participants' detailed allegations of ongoing under-reserving of insurance liabilities to manipulate earnings, Defendants had a fiduciary duty to investigate and determine whether the GE Stock Fund continued to be a prudent investment.

67.     Instead, Defendants made materially false or misleading statements to Plan participants concerning their benefits – the value of the GE Stock Fund, a Plan asset – when they repeatedly and unequivocally denied those participants' detailed allegations explaining how the reinsurance liabilities were under-reserved by $5 billion to $10 billion.

68.     Even if Defendants did not know that their denials of certain Plan participants allegations were false or misleading when they made them, Defendants had a fiduciary duty under ERISA to make corrective disclosures after they investigated the allegations and learned that these Plan participants were correct about the under-reserving and that Defendants' prior statements were either false or misleading.

---

[5] Available at: https://www.ge.com/investor-relations/sites/default/files/GE%204Q17%20Earnings%20Transcript%20012418.pdf.

69.     Disclosure would have also been consistent with the securities laws. Indeed, Defendants had a "duty to correct" under the securities laws, which arises after a party makes statements that it believes are true but later discovers were untrue or misleading when the statements were made.

70.     Further, even if Defendants did not have an independent fiduciary duty under ERISA to make a disclosure to correct their prior false or misleading statements to Participants, a prudent fiduciary in Defendants' position could not have concluded that disclosure would do more harm than good to the fund for the following reasons:

     *a.     Defendants knew, or would have known had they investigated, that their prior denials to Plan Participants were false or misleading.*

71.     Prior to disclosing the $15 billion shortfall, GE had never publicly disclosed that Employers Re's and Union Fidelity's admitted assets were insufficient to cover its reinsurance liabilities.

72.     As one investor commented, however, "it is hard to imagine that a $15 billion problem materialized in the course of a year…." General Electric Co. Insurance Update Call Transcript, Jan. 16, 2018 at page 9.

73.     Indeed, by 2009, or thereafter, Defendants either knew, or would have known had they investigated, that the insurance liabilities were under reserved by billions of dollars.

74.     For example, the Employers Re and Union Fidelity Annual Statements show that GE, through GE Capital, had to contribute over $2.3 billion to its insurance entities between 2005 and 2008 alone.

75.     The contributions did not stop after 2008: GE, through GE Capital, had to contribute an additional $2.6 billion to its insurance entities between 2009 and 2016, including over $418 million in 2016.

76.     While neither the Annual Statements nor other public filings explain why Defendant GE, through GE Capital, had to make billions of dollars in capital contributions to the two insurance entities, upon information and belief, GE made these contributions because,

without them, either Employers Re or Union Fidelity (or both) risked insolvency because they could not meet their reinsurance obligations.

77.     Recent reports also confirm that Defendants knew that GE's reinsurance liabilities were under-reserved by billions of dollars.

78.     As one newspaper reported, even though GE was selling its other insurance liabilities, GE "executives resisted selling reinsurance assets, even when bankers encouraged them," because "[d]oing so would have forced GE to book a huge charge to reflect a drop in value, according to people with familiar with the situation who asked for anonymity because they weren't authorized to speak. That was an indication that the business was worth less than what GE reported to investors." Sonali Basak, et. al., *GE's Surprise $15 Billion Shortfall was 14 Years in the Making*, CHICAGO TRIBUNE, (January 25, 2018).[6]

> **b.      Defendants had the authority to correct the under reserving and to disclose.**

79.     Defendants had the authority to cause a disclosure of the under reserved insurance liabilities in quarterly or annual SEC filings and, at the same time, to cause that same information to be disclosed to Participants. Indeed, Defendants had primary responsibility for the Company's public disclosures and SEC filings.

80.     Defendants also had the authority to correct the under-reserving problem at its insurance subsidiaries. Both insurance subsidiaries are wholly-owned subsidiaries of Defendant GE and, upon information and belief, both Defendants exercised ultimate control over all aspects of these two wholly-owned subsidiaries, including their finances.

81.     In fact, upon information and belief, not only did Defendants know of and approve the billions of dollars GE Capital transferred to both insurance subsidiaries, but at the same time Defendants had GE Capital pay over $43 billion in dividends to Defendant GE from 2009 to 2017. The following table, complied from the insurance company's annual statements

---

[6] Available at http://www.chicagotribune.com/business/ct-biz-ge-general-electric-accounting-20180125-story.html

and Defendant GE's SEC filings, reflects the flow of money that Defendants directed from GE
Capital to the insurance subsidiaries, and from GE Capital to Defendant GE:

| Year | GE Capital dividends paid to GE | GE Capital contributions to Employers Re | Employers Re contributions to Union Fidelity |
|------|--------------------------------|------------------------------------------|---------------------------------------------|
| 2017 | $4,000,000,000 | $3,500,000,000 | $1,000,000,000 |
| 2016 | $20,100,000,000 | $418,761,199 | $334,322,974 |
| 2015 | $4,300,000,000 | $0 | $0 |
| 2014 | $3,000,000,000 | $0 | $250,000,000 |
| 2013 | $6,000,000,000 | ($71,777) | $0 |
| 2012 | $6,400,000,000 | $964,405,774 | $570,432,191 |
| 2011 | $0 | $800,000,000 | $650,000,000 |
| 2010 | $0 | $348,903,851 | $175,000,000 |
| 2009 | $0 | $84,558,348 | $84,558,348 |
| 2008 | $2,400,000,000 | $849,219,369 | $400,000,000 |
| 2007 | $7,300,000,000 | $1,014,434,434 | ($287,075,183) |

       ***c.    Disclosure was inevitable and delaying disclosure would do more harm
to Participants than good.***

       82.    Defendants were going to have to disclosure the billions of dollars of under-
funded insurance liabilities and would be unable to hide the problem, because they inevitably
would have to fund the insurance subsidiaries with the billions of dollars needed to pay
policyholder claims as they came due.

       83.    Other insurers with under-funded long-term care liabilities inevitably had to
disclose the problem. For example, in 2008 Conseco had to move its older long-term care
policies to a trust and add an additional $175 million to the reserves to avoid insolvency, while in
2009 Penn Treaty Network America Insurance Company and its affiliated American Network
Insurance Company became insolvent and were liquidated.

       84.    The question Defendants faced by the close of 2009 or shortly thereafter,
therefore, was not whether they could prevent a stock drop by not disclosing the billions of
dollars of unfunded insurance liabilities, but when that stock drop would occur and how severe it
would be.

85.     A prudent fiduciary in Defendants' position, therefore, could not have concluded that publicly disclosing negative information sooner rather than later would do more harm than good to the fund.

86.     A prudent fiduciary would have realized that delaying for years an inevitable disclosure of billions of dollars of unfunded insurance liabilities that resulted in years of artificially inflated stock value would likely cause an even larger drop in the GE stock price – and thus cause even more harm to Participants in the GE Stock Fund – than if the problem was truthfully disclosed earlier.

87.     In fact, Defendant GE stated in 2007 court filings that even if it had disclosed the alleged under reporting of its insurance liabilities by approximate $11 billion, that this disclosure would have had materially adverse impact on GE's net earnings or share price. *See e.g.*, Defendants' Memorandum of Law in Support of Their First Motion to Dismiss the Entire Complaint for Failure to State a Claim, Doc. 45-2 at p. 31 (*In Re General Electric Company ERISA Litigation*, Case No. No. 06-CV-315 (N.D.N.Y.) (citations omitted) (stating that the price of GE stock actually *increased* when GE announced a large increase in its insurance reserves [of $3.4 billion on November 18, 2005]." (emphasis in original).

88.     Defendants' statements are consistent with economic studies concluding that "the sanctions, that is, stock market price drop, is less severe for firms that self-disclose." Surendranath R. Jory, Thanh N. Ngo, Daphne Wang & Amrita Saha, *The market response to corporate scandals involving CEOs*, 47:17 Applied Economics 1723, 1726 (2015).

89.     By contrast, the stock market price drop is more severe for companies that prolong a financial scandal. Economic analysis has shown that the overall reputational damage a company suffers because it perpetrates a prolonged financial scandal is significantly greater than any regulatory fines or other penalties that it may occur: "for every dollar of inflated value when a firm's books are cooked, firm value decreases by that dollar when the misrepresentation is revealed; in addition, firm value declines $0.36 more due to fines and class-action settlements and *$2.71 due to lost reputation*. For firms that survive the enforcement process as independent

17

entities, the estimate of lost reputation is *even greater at $3.83 per dollar of artificially inflated value*." Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43:3 Journal of Financial and Quantitative Analysis 581, 606 (2008) (emphasis added). These losses, unsurprisingly, grow the longer fraud goes on and the severity of the conduct increases. *See id.* at 603.

90.    Other studies have documented how the magnitude of loss is even greater when the company's misconduct is against related parties – such as shareholders – and is newsworthy because of the size of the dollar amounts involved and the surprise to the investment community. Murphy, Deborah L., Ronald E. Shrieves, and Samuel L. Tibbs, *Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk*, 44:1 The Journal of Financial and Quantitative Analysis 55, 57 and 70 (2009).

91.    This known risk of magnifying a stock drop by failing to immediately disclose material financial misconduct that effects the company's shareholders by prolonging an artificially high stock price is further reflected in a 2004 survey finding "that financial services organizations regarded reputational risk as the greatest threat to their market value." *See* Risk Perspectives: Bringing together leading risk management insights from the banking industry, p. 10 (PricewaterhouseCoopers, 2005).

92.    A prudent fiduciary in Defendants' position, therefore, would have realized that continuing to artificially inflate the stock price by misleading Participants and the public for years about billions of dollars of unfunded liabilities would only increase the reputational damages once the issue was inevitably disclosed, thus posing a greater threat to the GE Stock Fund's value, and the value of the Plan as a whole, than an earlier truthful disclosure and corrective action.

93.    Indeed, had Defendants made a corrective public disclosure by the close of 2009, or shortly thereafter, almost all of the artificial inflation of the GE stock price could have been avoided, and Plan participants who subsequently purchased and held the GE Stock Fund either would not have been harmed or any harm would been significantly less. In addition, Plan

18

participants would have had the information they needed to make an informed decision about whether to make future investments into the GE Stock Fund or other Plan assets.

94.     Instead, Defendants made the problem worse. As time passed, the GE stock price inflated and the size of the financial problems grew, making the eventual collapse worse and increasing the damage to the long-term prospects of GE common stock as an investment. This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

95.     In this case, moreover, Defendants made this inevitable loss even worse when, upon information and belief, Defendants spent over $24 billion from 2015 to 2017 repurchasing GE common stock –  with a large majority of these repurchases being made at an average price of over $30 per share – actions that further inflated the share price and encouraged Participants to either maintain their interests in, or make further contributions to, an increasingly inflated the GE Stock Fund rather than invest in other Plan assets.

ii.     **Eliminate the GE Stock Fund as an option for new contributions.**

96.     By the close of 2009, as an alternative action, Defendants could have eliminated the GE Stock Fund as an option for future contributions to the plan by Participants without further comment or explanation.

97.     Defendants had the authority to amend the Plan to eliminate the GE Stock Fund.

98.     Eliminating the GE Stock Fund in this manner would have been consistent with Defendants fiduciary duties in that it would have (a) prevented existing Participants, as well as future Participants in the Plan, from purchasing an artificially inflated asset (the GE Stock Fund), and (b) reduced the overall loss that the Plan ultimately experienced.

99.     By eliminating the GE Stock Fund as an investment option for new contributions to the plan , Defendants would have acted consistently with Defendants' duties under the securities laws.  This action involves neither the buying or selling of GE stock..

100.     In addition, Defendants would have disclosed no insider information to Participants and exercised no influence on the decisions of Plan participants who had already invested in the GE Stock Fund to hold or sell their existing interests in that fund.

101.      Nothing in ERISA requires plan sponsors and fiduciaries to make statements to participants explaining why they amended the Plan. Indeed, ERISA fiduciaries regularly amend or change Plan terms to add or eliminate a participant's investment options without explanation.

102.     Eliminating the GE Stock Fund in this manner would also have been consistent with the goal of the 2009 settlement to diversify the Plan assets, since approximately 40% of Plan assets were invested in the GE Stock Fund.

103.     There is no evidence that eliminating the GE Stock Fund in this manner, without comment or explanation, would do more harm than good to the Plan as (1) it would have caused Participants to invest in alternative options, thereby reducing the Plan's overall exposure to the risky and inflated GE common stock, and (2) there is no evidence that eliminating (as opposed to liquidating) the GE Stock Fund as an investment option going forward would have any material impact on the publicly-traded price of GE common stock or the overall value of the Plan, let alone a material impact that outweighed the benefits to the Plan of diversification.

**F.     Defendants' Were Also Hopelessly Conflicted.**

104.     Defendants were also financially conflicted as disclosing "bad news" risked hurting them financially even if it benefited Plan participants, while keeping the GE common-stock artificially inflated benefited them.

105.     Defendant GE benefited from an inflated GE common stock because, upon information and belief, its transfers of GE common stock to the GE Stock Fund in exchange for Participants' contributions was a ready source of financing for GE, and the Participant contributions it received only increased as it sold an inflated GE common stock to the Plan trust.

106.     Indeed, Defendant GE had a financial incentive to encourage Participant contributions to an inflated GE Stock Fund, and Defendant GE did encourage Participant

20

participation in the GE Stock Fund by announcing in 2015 a plan to spend up to $50 billion to repurchase GE common stock and also, upon information and belief, by spending approximately $42 billion between 2010 and 2017 to repurchase GE common stock.

107.    Nobody benefited more from an inflated GE common stock than Defendant Immelt because the stock price would heavily influence his compensation.  Indeed, "a significant portion of Mr. Immelt's compensation is at risk each year, tied to the company's operating and stock price performance; for 2015, 83% of his compensation was at risk."  General Electric Proxy Statement filed on April 27, 2016, at 34.

108.    The numbers bear this out.  Following the financial crash of 2008, when the stock price dropped, Immelt took home considerably less in compensation than in previous years.  His base salary for 2008 was $3.3 million, the equivalent of his 2007 base salary; however, for 2008, Immelt did not take a cash bonus.  Immelt's bonus for 2007 was $5.8 million.[7]

109.    These numbers increased dramatically in 2009, when Defendant Immelt was able to point to a rising stock price to justify substantial compensation.  The chart below shows the increasing value of Immelt's compensation by year from 2009 to 2017:

| Jeffrey Immelt Compensation by Year | Total Value of Compensation |
|---|---|
| 2009 | $9,885,240 |
| 2010 | $21,428,765 |
| 2011 | $21,581,228 |
| 2012 | $25,806,352 |
| 2013 | $19,776,716 |
| 2014 | $37,250,774 |
| 2015 | $32,973,947 |
| 2016 | $21,324,524 |
| 2017 | $8,111,267 |
| Total | $198,138,813 |

---

[7] "GE CEO to Decline 2008 Bonus," AP, *available at https://www.cbsnews.com/news/ge-ceo-to-decline-2008-bonus/*

110.    Further, Defendant Immelt's total retirement package was estimated to be nearly $211 million.[8] Equally important, as soon as he retired in October 2017, Defendant Immelt was given the ability to sell his sizable stock and stock option grants whenever he pleased, which means he had the ability to sell in 2017.[9]

111.    Defendant Immelt's lucrative compensation packages and other perks were only available to him because the GE common stock price was rising.  The stock price was rising only because Defendants were hiding significant liabilities and spending billions of dollars repurchasing shares rather than addressing those liabilities.

112.    In fact, soon after John Flannery took over as CEO in August 2017, he began the process of reformulating GE's executive compensation structure, announcing "comprehensive changes" and that compensation would "better align the team with investors."[10]  Flannery's objective was to quickly exit $20 billion in business and trim back on executive perks.

113.    Flannery took a smaller salary than his predecessor and for 2017 his total compensation was $9 million – 157 times the median GE employee's salary.  By contrast, Immelt earned an estimated $21.3 million in 2016 and $33 million for 2015, including bonuses.

114.    After Immelt's departure, GE announced that it would stop giving long-term cash awards to top employees and top employees would begin to receive half of their compensation in equity.  In March 2018, GE announced that, for 2017, it would not be paying annual executive bonuses for all except the head of GE's aviation unit.  This marked the first time in its 127-year history that GE did not pay its top executives a bonus.

115.    This aggressive and sudden belt-tightening at GE demonstrates that Flannery immediately realized tremendous and unsustainable issues with Defendants' bookkeeping practices that needed to be reconciled.

116.    GE recently announced more problems, and the stock price continues to drop.

---

[8] Jan Wieczner, *GE CEO Jeff Immelt's Retirement Pay May Be A Lot More Than You Think*, Fortune (June 12, 2017).
[9] *Id.*
[10] Ezequiel Minaya, *Executive Pay up for Review*, Wall Street Journal (Oct. 24, 2017).

G.      **Plaintiff's Experience.**

117.    Plaintiff Adele M. Varga is an employee of GE with a 401k retirement account.

118.    She Varga elected to invest a portion of her contributions to the plan in the GE Stock Fund.  In 2016, Ms. Varga elected to shift certain of her investment funds in the Plan into the GE Stock Fund from other investments.  She also  contributed a portion of her future contributions to the Plan  into the GE Stock Fund.  She has been harmed by the sharp drop in the price of GE Stock, which has caused the value of her retirement savings in the plan to drop.

119.    Plaintiff's experience and loss mirrors that of other Participants in the GE Stock Fund, as reflected in the graph below based on Defendant GE's Form 5500 filings with the Department of Labor:



120.    Had Defendants taken either of the alternative actions discussed above, Plaintiff and members of the putative Class would have avoided the losses that they have suffered as a

result of having their retirement funds in an imprudent investment that was for years artificially inflated and has subsequently dropped sharply in value.

## CLASS ACTION ALLEGATIONS

121.     Plaintiffs bring this action derivatively on the Plans' behalf pursuant to 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plans, Plaintiffs, and the following class of similarly situated persons (the "Class"):

> All participants or beneficiaries of the GE Retirement Savings Plan, excluding Defendants and their immediate family members, who (1) from January 1, 2010 or later directed that any contributions or matching funds in their Plan account be invested in the GE Stock Fund, and (2) continued to maintain that investment in the GE Stock Fund until January 19, 2018or later (the "Class period").

122.     Members of the class are so numerous that joinder is impracticable.  Plaintiffs are unable to ascertain the exact number of Class members at this time, however, that information can only be obtained through appropriate discovery.  Based on the most recent Form 5500 filed with the DOL in 2016, as of January 1, 2016, the Plan had over 240,000 participants.

123.     Plaintiffs' claims are typical of the claims of the members of the class because the Plan, Plaintiffs, and all other members of the class have each sustained damages arising from Defendant's wrongful conduct in violation of ERISA as described herein.

124.     Plaintiffs will fairly and adequately protect and represent the interests of the Plan and members of the Class.  Plaintiffs' interests coincide with those of the Class.

125.     Plaintiffs have retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

126.     Questions of law and fact common to the members of the Class predominate over questions that affect individual class members because virtually all of the legal and factual

questions in the case center on Defendant's conduct and Defendant's conduct affected the entire class similarly.

127.     Proceeding on a class-wide basis is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expenses that individual actions would entail. Class treatment will allow injured persons and entities to seek compensation for injuries that would not be practical to pursue individually. These benefits substantially outweigh any difficulties that may arise out of class treatment.

## CLAIMS FOR RELIEF

### Count I: Breach of Fiduciary Duty – Duty of Prudence

128.     Plaintiff realleges and incorporates by reference the allegations of the Complaint.

129.     As the Plan fiduciaries under ERISA, Defendants were required to act "for the exclusive purpose of … providing benefits to participants and their beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1101(a)(1).

130.     Defendants' duty of prudence under ERISA included an ongoing obligation to monitor and reevaluate the Plan's available investment options available – including the GE Stock Fund – and remove imprudent ones.

131.     As alleged previously, by 2006 Defendants either knew that the GE stock value – and thus the value of the GE Stock Fund – was artificially inflated because GE's insurance subsidiaries had under reserved their insurance liabilities by at least $5 billion to $10 billion, or at least were put on notice of detailed allegations that gave rise to a duty to investigate.

132.     Because Defendants were either aware that the value of the GE Stock Fund was artificially inflated, or would have been aware had they investigated, Defendants breached their

fiduciary duty of prudence by not taking any of the alternative actions alleged previously for the benefit of Plaintiff and putative class members.

133.    Plaintiff and putative class members have suffered financial damages as a direct and proximate result of Defendants breach of their fiduciary duties.

134.    Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties, to disgorge any profits, and to provide other equitable relief as appropriate pursuant to 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3).

### Count II: Breach of Fiduciary Duty – Duty of Loyalty

135.    Plaintiff realleges and incorporates by reference the allegations of the Complaint.

136.    Defendants were at all relevant times fiduciaries under ERISA.

137.    As fiduciaries, Defendants owed Plaintiff and the putative class a duty of loyalty – that is, a duty to discharge their duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

138.    Defendants breached the duty of loyalty by acting to further their own interests rather than the interests of the Plaintiff and the putative class, the Plan Participants.

139.    Defendant GE breached its duty of loyalty by placing its own financial interests in not disclosing potentially negative information ahead of its duty to provide accurate and truthful information to Plan Participants about the value of Plan benefits.

140.    As alleged previously, Defendant GE had a considerable incentive to breach the duty of loyalty and maintain the inflated market value of the GE stock because, upon information and belief, the Participant contributions it received in return for transferring GE common stock to the Plan trust for the GE Stock Fund was a valuable source of financing.

141.    As alleged previously, Defendant GE either (i) knew or subsequently learned that its statements to Plan participants regarding certain participants' allegations that the GE Stock Fund was inflated because it had under reserved for its insurance liabilities by $5 billion to $10

26

billion were false or misleading, or (ii) never investigated whether the Plan participants' allegations were correct.

142.    As a consequence, Defendant GE never took any of the alternative actions alleged previously not because it was concerned about any impact on the GE Stock Fund, but because it was concerned about its own financial well-being.

143.    Defendant Immelt breached his duty of loyalty by placing his own financial interests in not risking any drop in the value of GE common stock by disclosing potentially negative information ahead of his duty to provide retirement benefits to Plan participants and their beneficiaries.

144.    As alleged previously, Defendant Immelt had a considerable incentive to breach the duty of loyalty and maintain the inflated market value of the GE stock because his annual compensation and other financial perks were heavily tied to the stock's performance.

145.    As alleged previously, Defendant Immelt either (i) knew or subsequently learned that statements to Plan participants regarding certain participants' allegations that the GE Stock Fund was inflated because it had under reserved for its insurance liabilities by $5 billion to $10 billion were false or misleading, or (ii) never investigated whether the Plan participants' allegations were correct.

146.    As a consequence, Defendant Immelt never took any steps to ensure the Plan took any of the alternative actions alleged previously not because he was concerned about any impact on the GE Stock Fund, but because he was concerned about his own financial well-being.

147.    Plaintiff and putative class members have suffered financial damages as a direct and proximate result of Defendants breach of their fiduciary duties.

148.    Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties, to disgorge any profits, and to provide other equitable relief as appropriate pursuant to 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3).

**PRAYER FOR RELIEF**

Plaintiff respectfully requests the following relief:

A.      A Declaration that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plan and its Participants during the Class Period;

B.      A Declaration that but for Defendants' breaches of their fiduciary duties, the Plaintiff and putative class funds would have been invested in the most profitable of the alternative investment options.

C.      A Declaration compelling the Defendants to make good to the Plan on all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan Participants all profits that the Plan Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      A Declaration imposing a Constructive Trust on any amounts by which any Defendants were unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.      A Declaration awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      A Declaration requiring that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of GE maintained by the Plans in proportion to the accounts' losses attributable to the decline in GE's stock price;

G.      A Declaration awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      A Declaration awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      A Declaration awarding any other appropriate equitable relief the Court deems appropriate, including restitution.

## JURY DEMAND

Plaintiff demands a jury trial of all issues triable by right by jury.


Dated December 14, 2018

By:

/s/ Mitchell M. Breit
Mitchell M. Breit
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, New York 10016-7416
Telephone: (212) 784-6400
Facsimile: (212) 213-5949
mbreit@simmonsfirm.com

Charles J. Crueger
Erin K. Dickinson
Benjamin A. Kaplan
**CRUEGER DICKINSON LLC**
4532 N. Oakland Ave.
Whitefish Bay, WI 53211
Tel: 414-210-3868
Fax: 414-433-4544
cjc@cruegerdickinson.com
ekd@cruegerdickinson.com
bak@cruegerdickinson.com

Jonathan P. Kieffer
Tyler W. Hudson
Eric D. Barton
**WAGSTAFF & CARTMELL, LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: 816-701-1100
Fax: 816-531-2372
jpkieffer@wcllp.com
thudson@wcllp.com
ebarton@wcllp.com

29