# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ADELE VARGA, Individually and On Behalf of
All Others Similarly Situated,

     Plaintiff,

v.

GENERAL ELECTRIC COMPANY and
JEFFREY ROBERT IMMELT,

     Defendants.

Case No. 1:18-cv-1449 (GLS/DJS)

# PLAINTIFF'S MEMORANDUM IN OPPOSITION
# TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.     The Plan and Plan Fiduciaries ............................................................................... 2

II.    Plaintiff's Complaint ............................................................................................... 2

     A.     Plaintiff's claim for breach of the duty of prudence. ............................... 3

     B.     Plaintiff's claim for breach of the duty of loyalty .................................... 5

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT ....................................................................................................................... 6

I.     Defendants' fail to meet their burden of proof on their affirmative defenses. .................. 6

     A.     Claim preclusion does not bar Plaintiff's claims, because the claims could not have been brought in the 2006 action. ................................ 6

     B.     Plaintiff's claims accrued on or about January 16, 2018 and are timely. .............. 9

II.    Defendants are Plan fiduciaries as they had authority over the operation, management and administration of the Plan, including the GE Stock Fund. ........ 12

III.   Plaintiff states a claim that Defendants breached their duty of loyalty by, *inter alia*, encouraging participation in an inflated GE Stock Fund. ................................ 15

IV.   Plaintiff states a duty-of-prudence claim. ........................................................... 16

     A.     Plaintiff plausibly alleges that Defendants knew of the under-reserving problem sometime after 2010 and long before it was disclosed in 2018. ............. 16

     B.     Plaintiff's claim is consistent with *Fifth Third* and *Jander* ................................. 17

          1.     The Complaint alleges alternative actions consistent with the securities laws. ...................................................................................... 19

          2.     The Complaint alleges that disclosure was inevitable and, thus, a prudent fiduciary in Defendants' position would not have concluded that these alternatives actions would do more harm than good. ............... 20

     C.     Defendants' attempt to minimize or distinguish *Jander* is unpersuasive. ........... 22

     D.     Defendants also breached duties not at issue in *Fifth Third* or *Jander* ................. 24

CONCLUSION ................................................................................................................... 25

TABLE OF AUTHORITIES

**Cases**

*Agway, Inc. Emps.' 401(k) Thrift Inv. Plan v. Magnuson,*
    No. 5:03-CV-1060 (HGM/DEP), 2006 U.S. Dist. LEXIS 74670 (N.D.N.Y. July 13, 2006)... 14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................... 6

*Bennett v. Mfrs. & Traders,*
    2005 U.S. Dist. LEXIS 40592 (N.D.N.Y. Nov. 2, 2005) ........................................ 13

*Cokenour v. Household Int'l, Inc.,*
    No. 02 C 7921, 2004 WL 725973 (N.D. Ill. Mar. 31, 2004) .................................. 15

*Delta Holdings v. Nat'l Distillers & Chem. Corp.,*
    945 F.2d 1226 (2d Cir. 1991) .................................................................................. 16

*Elias v. Rolling Stone LLC,*
    872 F.3d 97 (2d Cir. 2017) ...................................................................................... 17

*Estate of Becker v. Eastman Kodak Co.,*
    120 F.3d 5 (2d Cir. 1997) ........................................................................................ 24

*Fentress v. Exxon Mobil Corp.*
    2019 U.S. Dist. LEXIS 16934 (S.D. Tex. Feb. 4, 2019) ........................................ 23

*Fifth Third Bancorp v. Dudenhoeffer,*
    573 U.S. 409 (2014) ........................................................................................... passim

*Garcia v. Doe,*
    779 F.3d 84 (2d Cir. 2014) ........................................................................................ 6

*Gearren v. McGraw-Hill Cos.,*
    690 F. Supp. 2d 254 (S.D.N.Y. 2010) .................................................................... 14

*Hill v. BellSouth Corp.,*
    313 F. Supp. 2d 1361 (N.D. Ga. 2004) .................................................................. 15

*In re Morgan Stanley ERISA Ligit.,*
    696 F. Supp. 2d 345 (S.D.N.Y. Dec. 9, 2009) ................................................. 12, 15

*In re Pfizer Inc. ERISA Litig.,*
    No. 04-civ-10071, 2009 WL 749545 (S.D.N.Y. July 10, 2015)......................... 6, 15

*In re WorldCom, Inc.,*
    263 F. Supp. 2d 745 (S.D.N.Y. 2003).................................................................... 12

TABLE OF AUTHORITIES

*In re WorldCom, Inc.,*
  263 F. Supp. 2d 745 (S.D.N.Y. 2003) .................................................................. 14

*In re YRC Worldwide, Inc. ERISA Litig.,*
  No. 09-2593, 2010 WL 4386903 (D. Kan. Oct. 29, 2010) ..................................... 15

*Jander v. Ret. Plans Comm. of IBM,*
  910 F.3d 620 (2d Cir. 2018) ........................................................................... passim

*L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Council of Suffolk, Inc.,*
  710 F.3d 57 (2d Cir. 2013) ................................................................................... 10

*Lawlor v. Nat'l Screen Serv. Corp.,*
  349 U.S. 322 (1955) ........................................................................................... 7, 9

*Marvel Characters v. Simon,*
  310 F.3d 280 (2d Cir. 2002) ............................................................................... 7, 8

*McAuley v. Int'l Bus. Mach. Corp.,*
  165 F.3d 1038 (6th Cir. 1999). ............................................................................. 25

*Mertens v. Hewitt Assocs.,*
  508 U.S. 248 (1993) ............................................................................................. 12

*Moreno v. Deutsche Bank Ams. Holding Corp.,*
  2016 U.S. Dist. LEXIS 142601 (S.D.N.Y. Oct. 13, 2016) ..................................... 10

*Mullins v. Pfizer, Inc.,*
  23 F.3d 663 (2d Cir. 1994) ................................................................................... 25

*Naftali v. N.Y. Deferred Exch. Corp.,*
  2017 U.S. Dist. LEXIS 130936 (E.D.N.Y. Aug. 15, 2017) .................................... 21

*Osberg v. Foot Locker, Inc.,*
  862 F.3d 198 (2d Cir. 2017) ........................................................................... 11, 12

*Postlewaite v. McGraw-Hill, Inc.,*
  333 F.3d 42 (2d Cir. 2003) ..................................................................................... 7

*Pugh v. Tribune Co.,*
  521 F.3d 686 (7th Cir. 2008) ............................................................................... 24

*Quan v. Comput. Scis. Corp.,*
  623 F.3d 870 (9th Cir. 2010) ............................................................................... 24

*Sjunde AP-Fonden v. General Electric Co., et al.,*
  Case No. 17-CV-8457 (S.D.N.Y.) ......................................................................... 17

## TABLE OF AUTHORITIES

*State St. Bank and Trust Co. v. Salovaara*,
   326 F.3d 130 (2d Cir. 2003)............................................................................... 16

*Stewart v. Thorpe Holding Co. Profit Sharing Plan*,
   207 F.3d 1143 (9th Cir. 2000) ........................................................................... 12

*Storey v. Cello Holdings, L.L.C*,
   347 F.3d 370 (2d Cir. 2003)................................................................................. 9

*TechnoMarine SA v. Giftports, Inc.*,
   758 F.3d 493 (2d Cir. 2014)........................................................................ 6, 8, 9

*Tibble v. Edison Int'l*,
   135 S. Ct. 1823 (2015)...................................................................... 7, 10, 14, 22

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006)............................................................................... 22

*Waldman v. Vill. of Kiryas Joel*,
   207 F.3d 105 (2d Cir. 2000)................................................................................. 8

*Whitley v. BP LLC*,
   Case No. 15-20282 (5th Cir.).............................................................................. 19

### Statutes

29 U.S.C. § 1002.................................................................................................. 2, 12

29 U.S.C. § 1102..................................................................................................... 12

29 U.S.C. § 1104.................................................................................. 8, 14, 15, 20

29 U.S.C. § 1113..................................................................................................... 10

### Rules

Fed. R. Civ. P. 8 ...................................................................................................... 6

## INTRODUCTION

Defendant GE surprised the world on January 16, 2018, when it announced that insurance subsidiaries that it had long maintained were solvent by nearly $2 billion were really insolvent by $15 billion. GE's common stock price dropped as a result and continued to drop after. Unfortunately, Defendant GE's 401(k) retirement plan offered as one investment option a GE Stock Fund whose value is tied to the value of the GE common stock. So when the value of the GE common stock plunged, so did the value of the GE Stock Fund, wiping out over $1 billion of retirement savings. Plaintiff Varga claims that this financial tragedy was largely, if not entirely, avoidable. She alleges that Defendant GE and Defendant Immelt knew in 2010 or after that the value of the GE Stock Fund was artificially inflated, because they knew in 2010 or after of the $15 billion problem with the insurance subsidiaries. Yet they never disclosed the problem to participants, or took any other action to protect their interests, even though the fund's value was destined to drop when Defendants would, inevitably, have to disclose the problem. Plaintiff claims that was a breach of Defendants' fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA).

According to Defendants, however, Plaintiff and the participants are out of luck because the settlement of an earlier lawsuit in 2009 extinguished their claim. But nothing in the settlement of that prior lawsuit entitled Defendants to engage in future unlawful conduct with immunity from further suit. Plaintiff's claim is based on Defendants' acts and breaches of fiduciary duty that occurred *after* that 2009 settlement. So nothing in the 2009 settlement precludes Plaintiff's claim. Indeed, the Second Circuit consistently holds in similar circumstances that *res judicata* is inapplicable.

Defendants' other arguments fair no better. Defendants are fiduciaries because the Plan says they are fiduciaries. Defendants' statute of limitation argument is contradicted by allegations they ignore and precedent they disregard. Their arguments about the duty of loyalty misstate the claim and ignore how Defendants encouraged investment in the GE Stock Fund because it benefited them financially. And Defendants' arguments about Plaintiff's duty of

1

prudence claim ask the Court to depart from Second Circuit precedent and rely on facts that contradict those pled in the Complaint. Indeed, from beginning to end, Defendants ignore Rule 12(b)(6)'s most basic principles to recast the Complaint in the light most favorable to themselves. They ignore well-pleaded facts, argue inferences in their favor, and offer incorrect interpretations of the law.  Defendants' motion to dismiss should be denied in its entirety.

## BACKGROUND

### I.        The Plan and Plan Fiduciaries.

The Plan is an employee pension benefit plan under ERISA and is what is commonly referred to as a 401(k) plan. Compl., ¶ 19. One of the Plan's investment options is the GE Stock Fund, an employee stock option plan (ESOP) that invests nearly all of its assets in GE common stock. *Id.*, ¶ 22. When a participant directs that contributions or matching funds be invested in the GE Stock Fund, the Plan trust, using participant contributions, purchases the necessary shares of GE common stock from Defendant GE. *Id.*, ¶ 23. The Plan owns the GE common stock, and the participant owns a proportional interest in the GE Stock Fund. *Id.* Any GE common stock the Plan needs to sell is purchased by Defendant GE at fair market value or, if Defendant GE elects not to repurchase the shares, it is sold on the open market. *Id.,* ¶ 24.

Defendant GE is the Plan sponsor and administrator and a fiduciary under 29 U.S.C. § 1002(21)(A). Defendant Immelt was GE's CEO and Chairman of the Board from 2001 until 2017, and at all relevant times a Plan fiduciary. Compl., ¶¶ 15, 28-29.

### II.       Plaintiff's Complaint.

Plaintiff Vargas is a long-time GE employee and Plan participant. *Id.*, ¶ 118. She brings this action on behalf of the Plan and a proposed class of Plan participants, other than Defendants, "who (1) from January 1, 2010, or later, directed that any contributions or matching funds in their Plan account be invested in the GE Stock Fund, and (2) continued to maintain that investment in the GE Stock Fund until January 19, 2018 or later (the "Class Period")." *Id*., ¶ 121.

In 2016, Plaintiff Vargas directed some of her Plan investments and future contributions into the GE Stock Fund. *Id.*, ¶ 118. When she made these elections, Defendants had never suggested that the GE Stock Fund was an imprudent investment.  To the contrary, Defendants had seven years earlier denied allegations that the GE Stock was artificially inflated because GE had under reserved for its insurance liabilities.  This denial was in a written notice directed solely to Plan participants and beneficiaries, including Plaintiff Vargas.  *Id.*, ¶ 48(b)-(d).

In July 2017, however, Defendant GE hinted at potential problems at its insurance subsidiaries. *Id.*, ¶¶ 52-53.  In October 2017, GE announced that Defendant Immelt, slated to retire that December, unexpectedly would resign his post as chairman. *Id.*, ¶ 54.  In November 2017 the new CEO questioned Defendant GE's ability to pay future dividends. *Id.*, ¶ 55.

Then, on January 16, 2018, Defendant GE unexpectedly announced that the insurance entities were insolvent by $15 billion because their reserve liabilities for blocks of long-term care insurance were $15 billion *more* than previously reported ($28 billion), a more than 50% increase. *Id.*, ¶¶ 56-57. The announcement surprised investors, who expressed disbelief in Defendant GE's explanation that the problem materialized only recently, stating that "it is hard to imagine that a $15 billion problem materialized in the course of a year." *Id.*, ¶¶ 61, 72. It also surprised the SEC, which opened an investigation.  *Id.*, ¶ 62. GE's common stock price has continued to drop since, from nearly $30 per share in 2017 to roughly $7 per share when Plaintiff filed her complaint.  *Id.*, ¶¶ 61-63.  As a result, the value of the GE Stock Fund also fell, erasing more than $1 billion dollars of retirement savings for Plan participants. *Id.*, ¶¶ 118-19.

### A.     Plaintiff's claim for breach of the duty of prudence.

Plaintiff claims that Defendants breached their fiduciary duty of prudence by failing to disclose the problem earlier. Defendants knew, or should have known, by the start of 2010 that the long-term care market had run into trouble. *Id.*, ¶¶ 82-83. The volatility and risk of policyholders living longer and incurring costs higher than originally assumed was well known by the end of 2009, by which time other long-term care insurers had disclosed large under-

reserved liabilities. *Id.*, ¶ 83. Defendants had no basis to conclude that their experience would be different. *Id.*, ¶ 82. Indeed, in 2006, certain Plan participants sued Defendants as fiduciaries alleging that the value of the GE Stock Fund was artificially inflated because the insurance entities had under reserved their insurance liabilities by $5 to $10 billion. *Id.*, ¶ 46. Defendants unequivocally denied *all* of these allegations in a written notice of the settlement that Defendants sent to all Plan participants in 2009. *Id.*, ¶ 48(b)(-(d). Even if Defendants believed that their statements were true when made, had they investigated the Plan participants' concerns after 2009, they would have discovered the problem and realized that their earlier statement to Plan participants was false or misleading. *Id.*, ¶¶ 72-78.

In fact, Plaintiff alleges that Defendants *did* discover the problem in 2010 or after but then delayed its inevitable disclosure. *Id.*, ¶ 78. It has now come to light that Defendants "resisted selling" the insurance entities, "even when bankers encouraged them" to do so, because a sale would have disclosed the problem and that the business was "worth less than what GE reported to investors." *Id.*, ¶ 78. From 2010 onward, Defendants filed Annual Statements stating that the insurance entities' assets exceeded their insurance liabilities by nearly $2 billion. *Id.,* ¶ 41. Yet Defendants also quietly directed another GE subsidiary to contribute over $2.6 billion to the insurance entities between 2009 and 2016. *Id.,* ¶ 75. Defendants never explained why insurance entities purportedly having nearly $2 billion in combined surplus needed billions in additional capital. *Id.,* ¶ 76. Plaintiff alleges that Defendants made these contributions for the same reason they refused to sell the insurance entities: to delay the inevitable disclosure of their massive under-reserving problems. *Id.,* ¶¶ 76-78. And disclosure was inevitable for the same reason other long-term care insurers had to disclose their under-reserved liabilities: inevitably, the insurance subsidiaries would need billions of dollars in cash that they did not have to pay policyholder claims. *Id.*, ¶ 82.

The question facing Defendants as fiduciaries, therefore, "was not whether they could prevent a stock drop by not disclosing the [problem], but when that stock drop would occur and how severe it would be." *Id.*, ¶ 84. Faced with the choice of prompt or delayed disclosure, a

4

"prudent fiduciary would have realized that delaying for years an inevitable disclosure of billions of dollars of unfunded insurance liabilities would likely cause an even larger drop in the GE stock price – and thus cause even more harm to Participants in the GE Stock Fund – than if the problem was truthfully disclosed earlier." *Id.*, ¶ 86. Indeed, economic studies show how the market punishes delayed disclosure more severely than prompt disclosure. *Id.*, ¶¶ 88-91. A "prudent fiduciary in Defendants' position, therefore, could not have concluded that publicly disclosing negative information sooner rather than later would do more harm than good to the fund." *Id.*, ¶ 85.

Yet from 2010 onwards, Defendants elected to do nothing. By not disclosing the problem earlier, Defendants allowed Plaintiff and participants to unwittingly invest in an imprudent GE Stock Fund that inevitably would drop in value and wipe out years of retirement savings. *Id.,* ¶¶ 61, 63. Alternatively, Defendants could have amended the Plan after 2010 to close the GE Stock Fund to further investment. *Id.*, ¶ 96. Either option could be done consistent with the securities laws. *Id.,* ¶¶ 69, 99-100. Either option would have minimized or avoided the tremendous financial harm to the Plan caused by delaying an inevitable disclosure for years. *Id.,* ¶¶ 82-95.

### B.   Plaintiff's claim for breach of the duty of loyalty.

Defendants chose not to disclose the $15 billion problem earlier because silence benefited them financially. *Id.,* ¶¶ 104-15. Defendant GE benefited from an inflated stock price because its transfers of GE common stock to the GE Stock Fund in exchange for participant contributions was a lucrative source of financing. *Id.*, ¶ 105. Indeed, Defendants encouraged participant investment in the inflated GE Stock Fund by announcing a $50 billion stock repurchase plan in 2015. *Id.*, ¶ 106. Defendant Immelt benefited immensely from an inflated stock price because a significant portion – up to 83% – of his $198 million in compensation between 2009 and 2017 was tied to GE's stock price. *Id.*, ¶ 107. Yet, the GE stock price was rising only because Defendants were either hiding significant liabilities or did not investigate despite clear warnings.

*Id.*, ¶ 111. Thus, Defendants breached the duty of loyalty by acting to further their own interests over the interests of Plan participants. *Id.*, ¶ 138.

## STANDARD OF REVIEW

Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. "To survive [a motion to dismiss], the complaint must simply 'contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Garcia v. Doe*, 779 F.3d 84, 97 (2d Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must "'accept[ ] as true the material facts alleged in the complaint and draw[ ] all reasonable inferences in plaintiffs' favor.'" *Id.*[1] There are no heightened pleading requirements for ERISA actions. *Jander v. Ret. Plans Comm. of IBM*, 910 F.3d 620, 631 (2d Cir. 2018). "ERISA actions are subject to the general notice pleading standard contained in Rule 8.…" *In re Pfizer Inc. ERISA Litig.*, No. 04-civ-10071, 2009 WL 749545, at *5 (S.D.N.Y. July 10, 2015). When, as here, the facts in the complaint and all reasonable inferences that can be drawn from them are sufficient to show a "plausible entitlement to relief," a motion to dismiss should be denied. *Twombly*, 550 U.S. at 555-56.

## ARGUMENT

**I.    Defendants fail to meet their burden of proof on their affirmative defenses.**

**A.    Claim preclusion does not bar Plaintiff's claims, because the claims could not have been brought in the 2006 action.**

*Res judicata* applies if: "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014). Since *res judicata* is an affirmative defense, it is Defendants' burden to show "with clarity and certainty" that preclusion

---

[1] All cited or quoted cases are omitted unless otherwise noted.

applies. *Postlewaite v. McGraw-Hill, Inc.*, 333 F.3d 42, 49 (2d Cir. 2003). Defendants cannot meet this burden.

Contrary to what Defendants' claim (Br. 9), they are not "being sued again for the same conduct" that occurred prior to the 2009 settlement. Plaintiff's claims arose after 2010 and are based on acts Defendants either took or failed to take after 2010 that caused over a billion dollars in losses to the Plan in 2018. Indeed, Defendants had a fiduciary duty to evaluate the GE Stock Fund "at regular intervals" from 2010 onward "to ensure [it was] appropriate." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). A fiduciary's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones," that "exists separate and apart" from duty "to exercise prudence in selecting investments" *Id.*, at 1828, 1829. Plaintiff alleges that Defendants' breached their fiduciary duty to monitor the GE Stock Fund from 2010 onward to ensure that it remained a prudent investment. It is "well settled" that a prior settlement "'cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.'" *Marvel Characters v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002) (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955)).

Nor did anything in the 2009 settlement entitle Defendants to engage in future unlawful conduct with immunity from further suit. Nothing in the 2009 settlement extinguished Defendants' fiduciary duty to monitor the GE Stock Fund from 2010 onward. Nothing in the 2009 settlement gave Defendants license post-2009 to mislead participants, conceal the problem and delay its inevitable disclosure. The parties agreed only to release all claims "(i) that *were asserted* in the Action … or (ii) that *could have been asserted* in the Action … that arise out of or relate, in whole or in part, to the facts, events, acts, omissions, transactions, or occurrences directly or indirectly alleged, asserted, or described in the Complaint, including (2) the Plan's holding of Company Stock for Participants in the Plan during the Class Period and/or (b) the Company's and/or its affiliates' insurance reserving practices *during the Class Period*."  Doc. 39-3, Santos Decl., Ex. K, at 578-79 (emphasis added). That "Class Period" ended on February 5, 2009. *Id.*, Ex. G at 427; Ex. K at 576. The plaintiffs in the 2006 action never agreed to

7

extinguish any future claims against Defendants. *See TechnoMarine*, 758 F.3d at 504 (holding that settlement agreement and stipulation of dismissal with similar language had no preclusive effect). Moreover, there was no finding in the 2006 action about the insurance problem or any other issue that would have a preclusive effect in this action. "[W]here a stipulation of settlement is 'unaccompanied by findings,' it does 'not bind the parties on any issue … which might arise in connection with another cause of action.'" *Marvel Characters*, 310 F.3d at 289.[2]

Nonetheless, Defendants contend (Br. 9) that *res judicata* bars Plaintiff's claims for the same reason it precluded the claims in *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105 (2d Cir. 2000), arguing that "Plaintiff's new Complaint in this case simply asserts 'additional instances of what was previously asserted'—continuing to allow investment in the GE Stock Fund despite purported knowledge of its inflated stock price and a failure to investigate or disclose insurance under-reserving." (Quoting *Waldman*, 207 F.3d at 113.) Yet *Waldman* held that *res judicata* applied because "it was simply not plausible to characterize [plaintiff's] claim as one based in any significant way upon post [first-action] facts." *Waldman*, 207 F.3d 113. That is not the case here. The conduct may be similar. But Plaintiff's claims are based on Defendants' acts and omissions *after* the settlement of the 2006 lawsuit and their breaches of fiduciary duties that arose *after* settlement of that prior lawsuit. And "*Waldman* did not hold that claims that are based on conduct that takes place after an earlier litigation are barred by *res judicata* simply because the conduct is similar to prior acts that took place before the earlier litigation." *TechnoMarine*, 758 F.3d at 503. *See also id.*, at 501 (if a complaint "relies on facts that occurred both before and after the earlier action commenced, claim preclusion will not bar a suit … 'based upon legally significant acts occurring *after* the filing of a prior suit that was itself based upon earlier acts.'").

Thus, Defendants misread the caselaw when they argue (Br. 8) that "[w]hat matters" for claim preclusion "is that the material factual allegations overlap." "That both suits involved

---

[2] It unlikely that a settlement purporting to waive Defendants' fiduciary duty by waiving future claims for breaches of fiduciary duties would be enforceable. *See* 29 U.S.C. § 1104(a)(1)(D) (fiduciary shall discharge duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].").

'essentially the same course of wrongful conduct' is not decisive," *Lawlor*, 349 U.S. at 327, and does not indicate that both suits are on the same cause of action. Thus, in *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370 (2d Cir. 2003), the court concluded that even though the facts overlapped, "*res judicata* does not bar the [second] Action," because the second "cause of action is predicated on conduct that post-dated the [first action]." *Id.*, at 378. In *TechnoMarine*, the court held that *res judicata* was no bar to the second trademark infringement claim "because [defendant] allegedly committed new instances of trademark infringement after the settlement, so that the present claim, to the extent based on the new acts of infringement, was not and could not have been litigated in the earlier proceeding." *TechnoMarine*, 758 F.3d at 502. That analysis applies here since Plaintiff's claims are predicated on conduct and breaches of fiduciary duty in or after 2010, and thus after the 2009 settlement.

In the end, Defendants' preclusion argument rests on a fundamental mischaracterization of why the prior lawsuit, and Defendants' denial of the allegations, is relevant to Plaintiff's claims. Plaintiff simply alleges that the prior lawsuit is relevant because its detailed allegations of under-reserving triggered the Defendants' duty to investigate. Compl., ¶ 66. Had the Defendants investigated at some point during or after 2010, they would have discovered that their prior written statement to Plan participants denying a problem existed was false and needed correction. *Id.*, ¶¶ 67-68. Plaintiff is not, as Defendants claim (Br. 9), "attack[ing] the prior settlement as inadequate to resolve the dispute." The Court should deny the motion to dismiss.

### B.     Plaintiff's claims accrued on or about January 16, 2018 and are timely.

Under ERISA, a breach of fiduciary action may not be commenced "after the earlier of":

(1)     six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2)     three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

*except* that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113 (emphasis added). The statute of limitations is an affirmative defense. Thus, Plaintiff is not required to plead facts establishing that her claims are timely. Defendants have the burden of proof and persuasion, and courts grant dismissal "only if 'it is clear from the face of the complaint'" that the claims are time barred. *Moreno v. Deutsche Bank Ams. Holding Corp.*, 2016 U.S. Dist. LEXIS 142601, at *10 (S.D.N.Y. Oct. 13, 2016). Defendants fall far short of meeting their burden.

First, Defendants' argument (Br. 9-10) about § 1113(1)'s six-year limitation period ignores Supreme Court precedent and grossly mischaracterizes Plaintiff's case. As stated above, *Tibble* held that an ERISA fiduciary's "duty of prudence involves a *continuing* duty" to monitor the GE Stock Fund, and "so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely [under § 1113(1)]." *Tibble*, 135 S. Ct. at 1829. As previously stated, Plaintiff alleges that Defendants violated their continuing fiduciary duty to monitor the GE Stock Fund throughout the Class Period – that is, from January 1, 2010 onward – as well as their fiduciary duties to investigate and correct prior false statements made to Plan participants. Compl., ¶ 66-68. Defendants also breached their fiduciary duties during the Class Period by taking actions to conceal these breaches, including making material misrepresentations and trying to delay the inevitable disclosure of the problem. *Id.*, ¶¶ 71-78. Nothing in the Complaint makes it "clear" that the last of any or all of these acts occurred over six years before Plaintiff filed her complaint. To the contrary, it is reasonable to infer from the allegations that "the date of the last action which constituted a part of the breach or violation," § 1113(1), was less than six-years before Plaintiff filed her complaint.

Second, nothing in the Complaint suggests that Plaintiff had actual knowledge of Defendants' breaches until Defendant GE disclosed the problem on or about January 16, 2018. "Under the three-year limitations period in [§ 1113(2)], actual knowledge is strictly construed and constructive knowledge will not suffice." *L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Council of Suffolk, Inc.*, 710 F.3d 57, 67 (2d Cir. 2013). In fact, Plaintiff alleges that

she had no knowledge of the problems until Defendant GE disclosed it in 2018. Compl., ¶ 6. Accordingly, her claim is timely under § 1113(2)'s three-year limitation period.

Finally, Defendants fail to address Section 1113's six-year fraud or concealment exception even though "on the face of the complaint" it applies. "In this Circuit, 'fraud or concealment' is read disjunctively, such that the exception applies in cases of fraud or concealment." *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 209 (2d Cir. 2017). The "concealment" exception applies when "a fiduciary … engaged in acts to hinder the discovery of a breach of fiduciary duty," and "properly understood" requires no proof of common-law fraud. *Id.* at 210. Instead, it applies when the "defendant committed either: (1) a 'self-concealing act' -- an act committed during the course of the breach that has the effect of concealing the breach from the plaintiff; or (2) 'active concealment' -- an act distinct from and subsequent to the breach intended to conceal it." *Id.* at 211. Thus, the court in *Osberg* held that the concealment exception applied because the defendant's failure to disclose the problem and misrepresentations to keep it hidden were "self-concealing acts" that hindered discovery of the breach. *Id.*

So it is here. The Complaint alleges that Defendants failed to disclose and actively concealed the under-reserving problem for years. Defendants consistently maintained in public filings that the insurance entities were solvent by nearly $2 billion and could pay policyholder claims. Compl., ¶¶ 41-45, 51. Defendants actively concealed the breaches when they refused their bankers' advice to sell the insurance entities because a sale would expose the problem. *Id.*, ¶ 78. In 2009, Defendants told Plan participants in writing that there was no problem, and then failed to correct that false statement when they discovered it was untrue. *Id.,* ¶¶ 48-50, 67. Instead, Defendants also tried delaying the inevitable disclosure by quietly directing a subsidiary to contribute over $2 billion to these supposedly solvent insurance entities. *Id.*, ¶ 75. Plaintiff also alleges how Defendants successfully concealed the problem not only from Plan participants but from the public, including sophisticated institutional investors who expressed disbelief when Defendant GE finally disclosed the $15 billion problem. *Id*., ¶ 72.  Given these allegations about how Defendants "'hinder[ed] the discovery of [their] breach of fiduciary duty,'" *Osberg*, 862

11

F.3d at 211, there is no basis to conclude "on the face of the complaint" that Plaintiff's claims are time barred.

## II.    Defendants are Plan fiduciaries as they had authority over the operation, management and administration of the Plan, including the GE Stock Fund.

To show a defendant's fiduciary status in compliance with Rule 8, "[a]n ERISA complaint need 'do little more than track the statutory definition of fiduciary.'" *Morgan Stanley,* 696 F. Supp. 2d at 365 (quoting *In re WorldCom, Inc.,* 263 F. Supp. 2d 745, 759 (S.D.N.Y. 2003)). In passing ERISA, Congress "expand[ed] the universe of persons subject to fiduciary duties" by defining "'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original). One way "a person is a fiduciary with respect to a plan" is if "he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

Defendant GE fits squarely into that functional definition. GE is the Plan administrator, *see* Comp., ¶ 27 and Santos Decl., Ex. A at 3; Ex. B at 17, and thus a named fiduciary under 29 U.S.C. § 1102(a)(2). Further, "[u]nder the terms of the Plan, [Defendant GE] has authority over the control and management of the operation and administration of the Plan." Compl., ¶ 27. Defendants claim (Br. 12) that Plaintiff's allegation is "conclusory and fails," apparently not realizing that the allegation mirrors the Plan language. The Plan states that "the control and management of the operation and administration of the Program *shall be vested* in the Company [Defendant GE]." Santos Decl., Ex. C at 77-78; Ex. D at 174.

Defendant Immelt is a fiduciary because when an "entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000). Courts have rejected idea "that where a corporation is designated as the plan fiduciary, an officer's actions will not render that officer a fiduciary where those actions are ones with which the designated named fiduciary is chargeable."

12

*Bennett v. Mfrs. & Traders*, 2005 U.S. Dist. LEXIS 40592, at *22-23 (N.D.N.Y. Nov. 2, 2005). Thus, Defendant Immelt is a fiduciary because, as Defendant GE's CEO and Chairman of the Board, he was responsible for carrying out Defendant GE's fiduciary functions, such as monitoring the GE Stock Fund. Compl., ¶¶ 15, 28-29.

Citing documents outside the Complaint, Defendants argue (Br. 12-13) that neither of them had fiduciary responsibility for "investment decision-making," claiming that this discretionary authority was delegated to "the Plan trustees." The Plans that Defendants submitted say otherwise. They state that unless any of Defendant GE's fiduciary responsibilities "have been *expressly*" delegated to other fiduciaries, "the control and management of the operation and administration of the Program *shall* be vested in the Company [Defendant GE]." Santos Decl., Ex. C at 77-78; Ex. D at 174. Nothing in the Plan expressly delegates Defendant GE's fiduciary responsibility to monitor the GE Stock Fund to a different fiduciary. The Plan does delegate authority to "the Committee" to monitor, remove, and add *other* identified investment options. *Id.*, Ex. C at 58 ("any specific fund referred to in the immediately preceding paragraph … may also be eliminated as an investment alternative under the Program by the Committee … as the Committee may determine"); Ex. D at 150. The GE Stock Fund is conspicuously excluded from the list of investment funds over which the Committee is delegated the authority to monitor or remove. Per the Plan, therefore, that fiduciary duty remains vested with Defendant GE.

The Plan Trust suggests why Defendant GE's authority to monitor the GE Stock Fund was never delegated to a different fiduciary. In a gambit to avoid liability for offering an imprudent GE Stock Fund, Defendant GE inserted language into the Trust stating that because the "Plan requires the Stock Fund be offered as an investment option. … [N]either the Trustee nor any other plan fiduciary is responsible pursuant to the Plan or this [Trust] Agreement to monitor the suitability of acquiring and holding Sponsor [GE] Stock." Santos Decl., Ex. E at 261. That provision is a nullity. The Supreme Court has expressly rejected the argument that by "commanding the ESOP fiduciary to invest primarily in [company stock]," the "plan documents waived the duty of prudence." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 422-23

13

(2014). "'[T]rust documents cannot excuse trustees from their duties under ERISA.'" *Id.* Prudent fiduciaries "cannot assume" that an investment that was prudent at the outset "will remain so indefinitely." *Tibble*, 135 S. Ct. at 1828. "[A] plan agreement cannot extinguish the fiduciary status of a named fiduciary simply by commanding him to take certain actions." *Gearren v. McGraw-Hill Cos.*, 690 F. Supp. 2d 254, 264 (S.D.N.Y. 2010). Nothing in the Trust waives Defendants' continuing fiduciary duty to monitor the GE Stock Fund.

Defendants' point (Br. 11) about amending a plan being a "settlor" function, not a fiduciary act, is an attempt to side-step the fiduciary obligation that Plaintiff contends was breached. Plaintiff alleges that the breach occurred from Defendants failing to monitor the GE Stock Fund and/or failing to act. One alternative action that Defendants could have taken was closing the GE Stock Fund to additional investment. That Defendants could have accomplished this by amending the Plan is beside the point in terms of determining whether a fiduciary duty exists. *See Agway, Inc. Emps.' 401(k) Thrift Inv. Plan v. Magnuson*, No. 5:03-CV-1060 (HGM/DEP), 2006 U.S. Dist. LEXIS 74670, at *58-60 (N.D.N.Y. July 13, 2006) (denying dismissal because while "amendment of the Plan would not be a fiduciary act," plaintiffs do not complain solely about lack of amendment but "the lack of any action taken by Plan fiduciaries").

Finally, Defendants ignore how ERISA imposes a "prudent man" standard of care on *all* Plan fiduciaries. 29 U.S.C. § 1104(a)(1)(B). A fiduciary in Defendants' position, having knowledge that a Plan asset is artificially inflated by billions of dollars and acting "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use," *see* § 1104(a)(1)(B), would not sit on that information and withhold it from those fiduciaries having authority to monitor Plan investments. *In re WorldCom, Inc.,* 263 F. Supp. 2d 745, 765 (S.D.N.Y. 2003) ("Plaintiffs' allegation that Ebbers failed to disclose to the Investment Fiduciary and the other investing fiduciaries material information he had regarding the prudence of investing in WorldCom stock is sufficient to state a claim."). Thus, even if Defendants are somehow correct that they had no formal responsibility for monitoring the GE Stock Fund, the allegations show that they acted

14

inconsistent with the "prudent man" standard of care by not communicating material information about that investment to the relevant fiduciaries.

### III.   Plaintiff states a claim that Defendants breached their duty of loyalty by, *inter alia*, encouraging participation in an inflated GE Stock Fund.

ERISA's duty of loyalty requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and [] for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Consistent with that statutory definition, courts have refused to dismiss duty of loyalty claims where defendants' stock ownership and sales were tied to an incentive to encourage plan investment in company stock. *See, e.g., In re Morgan Stanley ERISA Ligit.*, 696 F. Supp. 2d 345, 365-66 (S.D.N.Y. Dec. 9, 2009) (conflict of interest claim met pleading standards where plaintiffs alleged that defendants' significant investments in Morgan Stanley stock were incentive to maintain the plans' investment in company stock against participant's interests); *In re Pfizer Inc. ERISA Litig.*, No. 04-civ-10071, 2009 WL 749545, *36-37 (S.D.N.Y. July 10, 2015) (upholding conflict-of-interest claim where plaintiff alleged that the defendants engaged in a pattern of deception concerning problems with Celebrex and Bextra, withheld material information about the condition of their company, and encouraged Plan investment in company stock, while receiving stock tied to their compensation).[3] That is the case here. Defendants read the Complaint far too narrowly when they argue (Br. 15) that Plaintiff's claim is premised "on nothing more than the financial interest corporations and their officers necessarily have in the share price of company stock."

---

[3] *See also In re YRC Worldwide, Inc. ERISA Litig.*, No. 09-2593, 2010 WL 4386903, at * 9 (D. Kan. Oct. 29, 2010) (allegations that defendants received compensation in stock which created conflict of interest between their interests and plan participants plausibly stated a claim); *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004) (fiduciaries whose compensation was tied to the price of employer stock had an incentive to boost the value that conflicted with the interests of plan participants sufficient to state a duty of loyalty claim); *Cokenour v. Household Int'l, Inc.,* No. 02 C 7921, 2004 WL 725973, at *6 (N.D. Ill. Mar. 31, 2004) (same).

Indeed, Plaintiff expressly alleges that Defendants encouraged participation in the inflated GE Stock Fund by announcing a $50 billion stock repurchase plan in 2015. Compl., ¶ 106. Defendant GE benefited from an inflated stock price and increased participant participation in the GE Stock Fund, because the contributions it received in exchange for the GE common stock it transferred to the GE Stock Fund was a cheap and lucrative source of financing. *Id.* at ¶ 105. Defendant Immelt benefited immensely from an inflated stock price because a significant portion of his compensation was tied to GE's stock price. *Id.* at ¶ 107. Yet the GE stock price was rising, and participation in the GE Stock Fund continued, only because Defendants either were hiding significant liabilities or did not wish to investigate despite clear warnings. *Id.* at ¶ 111. These allegations plausibly state a claim that defendants failed to act with an "eye single to the interests of the participants and beneficiaries." *State St. Bank and Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003).

## IV.    Plaintiff states a duty-of-prudence claim.

### A.    Plaintiff plausibly alleges that Defendants knew of the under-reserving problem sometime after 2010 and long before it was disclosed in 2018.

As an initial matter, Defendants raise several factual arguments about insurance reserving practices to dispute when they first learned of the problem or when it arose. Not only are Defendants' self-serving factual arguments inappropriate on a motion to dismiss, but they are also contrary to Plaintiff's allegations and common experience. For example, Defendants claim (Br. 16-17) that there purportedly is a "well-established uncertainty and variability inherent" in setting insurance reserves; thus, it supposedly is a "leap of logic" to infer that Defendants in 2009 or after knew of the problem until shortly before GE announced the $15 billion shortfall in 2018. But an insurer announcing that it underestimated reserves by *over* 50% of what it previously reported is (thankfully) unheard of.[4] Further, Plaintiff alleges that Defendants knew of

---

[4] The primary case Defendants quote about the purportedly uncertainty of reserving – *Delta Holdings v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226 (2d Cir. 1991) – is reciting findings of fact after a bench trial and not making conclusions of law about the mathematics of actuarial risk assessment.

the problem and tried to delay disclosure by refusing the sell the entities and by having another GE entity quietly prop up the entities financially. *See supra*, at p. 4-5.

Defendants also stretch credulity by claiming (Br. 19) that the "natural" explanation for the $15 billion shortfall is relatively recent changes in claims experience and "other factors." The SEC does not believe that explanation and opened an investigation. Compl., ¶ 62. Investors openly disparaged it, *id.*, ¶ 72, and filed a pending securities fraud case, *see Sjunde AP-Fonden v. General Electric Co., et al.*, Case No. 17-CV-8457 (S.D.N.Y.). Business reporters concluded just the opposite and reported on how Defendants misled investors to delay disclosure. *Id.*, ¶ 78. Nobody believes Defendants because there have been looming, intractable problems in the long-term care business since at least 2008, when other insurers had no choice but to disclose under-reserved liabilities. *Id.*, ¶ 82. Yet even though the risk and volatility were known, Defendants never disclosed any underlying problems. A "natural" explanation for this is that Defendants opted to delay disclosure for as long as possible to reap for themselves the benefits of a higher stock price. And a "natural" explanation for GE's new leadership disclosing the $15 billion shortfall right after Defendant Immelt unexpectedly left earlier than planned is that new leadership decided to do what a prudent fiduciary would have done years ago – disclose the problem. In any case, "the relevant determination is whether [the] proffered interpretation is plausible, not whether other plausible interpretations exist." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 106 (2d Cir. 2017). Accepting Plaintiff's allegations as true, she plausibly alleges that Defendants knew of the problem long before it was disclosed in 2018.

### B.    Plaintiff's claim is consistent with *Fifth Third* and *Jander*

In *Fifth Third*, the Court rejected "a defense-friendly" presumption that an ESOP fiduciary acted prudently by investing in company stock.  *Fifth Third*, 573 U.S. at 412. ERISA created no "special presumption favoring ESOP fiduciaries," particularly one that made "it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious." *Id.* at 418, 425. Instead, the court must engage in a "careful, context-sensitive scrutiny" of Plaintiff's

allegations to determine if they plausibly state a claim that defendants acted imprudently. *Id.* at 425. "To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id.* at 428.

In *Jander*, the Second Circuit held that allegations that disclosure of the truth was inevitable were "particularly important" to state a plausible claim for relief under *Fifth Third*. *See Jander*, 910 F.3d at 630. The court explained how, in the "normal case," a fiduciary's evaluation of whether disclosure would do more harm than good makes "a comparison only to the status quo of non-disclosure." *Id.* In *Jander*, however, disclosure was "inevitable," since the company was likely to be sold and the overvaluation made public. *Id.* Thus, "non-disclosure is no longer a realistic point of comparison" for a prudent fiduciary's evaluation of whether to disclose. *Id.* Instead, "the prudent fiduciary would have to compare the benefits and costs of earlier disclosure to those of later disclosure." *Id.* And "when a 'drop in the value of the stock already held by the fund' is inevitable, *Fifth Third*, 573 U.S. at 430, it is far more plausible that a prudent fiduciary would prefer to limit the effects of the stock's artificial inflation on the ESOP's beneficiaries through prompt disclosure." *Id.*

The complaint in *Jander* bolstered that conclusion by citing economic analysis showing how knowingly delaying the disclosure of fraud causes "reputation damage" that grows with time and translates "into larger stock drops." *Id.* at 629. "A reasonable business executive could plausibly foresee that the inevitable disclosure of longstanding corporate fraud would reflect badly on the company and undermine faith in its future pronouncements." *Id.* The court also rejected the argument that early disclosure was inconsistent with *Fifth Third* because a drop in the value of the stock already held by the fund could be substantial. *Id.* at 631. "[A] stock-drop following early disclosure would be no more harmful than the inevitable stock drop that would occur following a later disclosure." *Id.* Further, because the stock traded on an efficient market, plaintiff "plausibly allege[d] that a prudent fiduciary need not fear an irrational overreaction to

18

the disclosure of fraud." *Id.* at 630. In fact, a prudent fiduciary would fear overreaction due to delayed disclosure since "[r]ational investors could well conclude that companies that allow fraud to continue longer are more poorly run …." *Id.,* at 630. n.3. Accordingly, the court reversed dismissal on the pleadings, holding that plaintiff's allegations and proposed alternative action "plausibly establish that a prudent fiduciary in the Plan defendants' position could not have concluded that corrective disclosure would do more harm than good." *Id.*, at 628.

> 1.      The Complaint alleges alternative actions consistent with the securities laws.

In *Fifth Third*, the Court stated that the duty of prudence cannot require a fiduciary to violate the securities laws, and any proposed alternatives should avoid conflict with the insider trading and corporate disclosure requirements of the federal securities laws "or with the objectives of those laws." *Fifth Third*, 573 U.S. at 428-29.  Plaintiff's proposed alternatives satisfy both considerations. Defendants were "uniquely situated" as they had the authority to make an early disclosure. Compl., ¶ 79; *Jander*, 910 F.3d at 628-29. Defendants would have acted consistent with their duties under the securities laws had they made an early corrective disclosure to Plan participants while, at the same time, disclosing the problem in GE's quarterly or annual SEC filings. *Jander*, 910 F.3d at 629. Both the Department of Labor and SEC also agree that such a disclosure would not violate the securities laws. *See Whitley v. BP LLC*, Case No. 15-20282 (5th Cir.), Doc. 191-1 (DOL amicus brief) and Doc. 191-2 (SEC amicus brief). Similarly, closing the fund to new investments would also be consistent with the securities laws, as it involved neither the buying nor selling of GE stock to the public. Under the Plan, Defendant GE could purchase any company stock the Plan trust needed to sell based on Participants switching investments out of the GE Stock Fund. *Id.*, ¶¶ 24, 99. Further, nothing in ERISA required Defendants to explain why they amended the Plan. Defendants would have disclosed no insider information and exercised no influence on Plan participants' decisions to sell or hold their existing interests in the fund.  *Id.*, ¶¶ 100, 101.

2.      The Complaint alleges that disclosure was inevitable and, thus, a prudent fiduciary in Defendants' position would not have concluded that these alternatives actions would do more harm than good.

Plaintiff's allegations also satisfy *Fifth Third's* requirement that a prudent fiduciary in Defendants' position would not have concluded that these alternatives would do more harm than good. *Fifth Third*, 573 U.S. at 430-31. Defendants had insider knowledge of the problem and disclosure was inevitable. Compl., ¶¶ 82-84. Defendants may have tried to delay disclosure by filing statements that insurance subsidiaries were solvent, by refusing to sell the troubled insurance entities, and by contributing over $2.6 billion to cover their operating losses and pay claims as they came due. *Id.*, ¶¶ 71-78. Nonetheless, as in *Jander*, actions by third parties beyond Defendants' control would inevitably force disclosure of the problem. *Jander*, 910 F.3d at 630. Inevitably, policyholders would file claims requiring the insurance entities to pay billions of dollars to policyholders that the entities did not have, thus exposing the problem. Compl., ¶ 82. Defendants were powerless to stop policyholders from making claims "and would be unable to hide the problem" forever. *Id.* Plaintiff plausibly alleges that Defendants knew about the problem for years and disclosure was inevitable. *Jander*, 910 F.3d at 631 (heightened pleading standard "does not apply to ERISA actions").

Since disclosure was inevitable, a prudent fiduciary in Defendants' circumstances "would not have viewed [disclosure] as more likely to harm the fund than to help it." *Fifth Third*, 573 U.S. at 428.  ERISA directs ESOP fiduciaries to discharge their duties "for the exclusive purpose of … providing benefits to [plan beneficiaries]." 29 U.S.C. § 1104(A)(1)(a)(i). "Benefits" means "financial benefits (such as retirement income)." *Fifth Third*, 573 U.S. at 421. The question Defendants had to consider, therefore, was whether the benefits and costs of early disclosure outweighed delayed disclosure on the value of Plan beneficiaries' retirement benefits. *Jander*, 910 F.3d at 630. No prudent fiduciary in Defendants' circumstance could conclude that prompt disclosure—as opposed to allowing ESOP beneficiaries to invest for years in an inflated asset, the value of which would drop and erase years of retirement savings—was more likely to harm the fund than help it. The market may, as Defendants claim (Br. 21), "punish[] uncertainty," but

20

a prudent fiduciary would understand that the market punishes even more severely hiding schemes to defraud investors – a lesson GE is learning today. Compl., ¶¶ 85-91. Had Defendants made an earlier corrective public disclosure, "almost all of the artificial inflation of the GE stock price could have been avoided," the harm caused would have been "significantly less," and participants would have had the necessary information to make informed decisions about future investments into the GE Stock Fund.  *Id.*, ¶ 93.

Plaintiff bolsters her allegations with economic studies showing how, to give one example, "for every dollar of inflated value when a firm's books are cooked, firm value decreases by that dollar when the misrepresentation is revealed; in addition, firm value declines [by another] \$2.71 due to lost reputation," and these losses grow the longer the fraud continues. Compl., ¶ 89; *see also, id.* ¶¶ 85-91. Accordingly, "it is far more plausible that a prudent fiduciary would prefer to limit the effects of the stock's artificial inflation on the ESOP's beneficiaries through prompt disclosure." *Jander*, 910 F.3d at 630.

Alternatively, Plaintiff alleges that Defendants could have eliminated the GE Stock Fund as an option for future contributions by Participants. *Id.*, ¶ 96. Defendants had the authority to amend the Plan to eliminate the GE Stock Fund. *Id.*, ¶ 97. Closing the GE Stock Fund to new contributions also would have (a) prevented participants from purchasing an artificially inflated asset (the GE Stock Fund), and (b) reduced the overall loss that the Plan ultimately experienced. *Id.*, ¶ 98. There is no evidence (beyond speculation) that maintaining the GE Stock Fund, but eliminating future investments, would materially impact the publicly-traded price of GE common stock. *Naftali v. N.Y. Deferred Exch. Corp.*, 2017 U.S. Dist. LEXIS 130936, at \*20 (E.D.N.Y. Aug. 15, 2017) (defendants' speculation "is not a sufficient basis to dismiss"). Defendants' action to close the fund to future investments would have been viewed as consistent with Defendants' public commitment to reduce the percentage of Plan assets invested in the GE Stock Fund.  *Id.*, ¶¶ 102-03. More importantly, disclosure of the underlying insurance problem was inevitable. Thus, a prudent fiduciary in Defendants' position could not have concluded that both proposed alternatives would do more harm than good. *Fifth Third*, 573 U.S. at 430-31. Indeed, a

fiduciary violates its duty of prudence by knowingly allowing participants to invest in a plan asset whose value is artificially inflated. *See Tibble*, 135 S. Ct. at 1829.

### C.      Defendants' attempt to minimize or distinguish *Jander* is unpersuasive.

Defendants raise three arguments to distinguish *Jander*, but none bear scrutiny. First, Defendants dispute (Br. 24) that disclosure was inevitable, claiming they supposedly had the "choice" to "wait and see how claims experience and other factors developed over the next decade." Knowingly withholding material information from investors so as to "wait and see" if the problem magically resolves itself is not a viable alternative option. People face criminal liability for making that sort of "choice." *See e.g., United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006) (intentionally misleading investors a felony under 15 U.S.C. § 78ff). Further, Defendants' hope that billions of dollars of unfunded insurance liabilities will vanish with time is implausible speculation that contradicts Plaintiff's allegations. Again, other long-term care insurers had to disclose under-reserved liabilities as early as 2008, or were eventually put into liquidation, and nothing in the Complaint suggests that Defendants' experience in a financially troubled industry would be any different. Compl., ¶¶ 82-84. Accepting Plaintiff's allegations as true, it is plausible that, as with other long-term care insurers, the disclosure of $15 billion in under-reserved insurance liabilities was inevitable.

Next, Defendants argue (Br. 23-24) that *Jander* requires the disclosure to be not just inevitable, but also "imminent," "in the very near term," in "just a matter of months," or foreshadowed by a "major triggering event." The court used none of these qualifying terms, which is unsurprising as it would encourage and reward long-term malfeasance. In fact, *Jander* explained how delaying disclosure of a problem that inevitably would be revealed, even if years off, magnifies the harm: "A reasonable business executive could plausibly foresee that the inevitable disclosure of *longstanding* corporate fraud would reflect badly on the company and

undermine faith in its future pronouncements." *Jander*, 910 F.3d at 629 (emphasis added). Under *Jander*, the issue is not whether disclosure was imminent, but if it "was inevitable." *Id.*, at 630.[5]

Finally, Defendants speculate (Br. 24) that a prudent fiduciary, fearing an "irrational overreaction to the disclosure," would not have made a corrective disclosure at the close of 2009 when the market purportedly was "extremely volatile and overreactive." But GE was a financially strong company at the close of 2009, and Defendants overlook how, in 2008, they claimed that GE's prompt disclosure of a previous underfunding issue had no material negative impact on GE's stock price – a point consistent with the studies Plaintiff cites about the relative risks of prompt versus delayed disclosure. Compl., ¶¶ 87-91. Also, while Defendants focus on the close of 2009, they offer no explanation as to why a prudent fiduciary still would refuse to disclose the problem in 2010, 2011, 2012 or any year thereafter until 2018. That is because Defendants' real intent is to put Plan participants in an impossible "heads I win, tails you lose" dilemma: if the market is down, they claim a fiduciary will fear an irrational overreaction; if the market is up, they claim a fiduciary will fear a large drop in the relative value of the fund. And since markets are either going up or down, Defendants' ultimate point is no scenario exists where ESOP fiduciaries have a duty to disclose. But this is all just a back-handed way of arguing for a non-rebuttable presumption of prudence that the Supreme Court rejected in *Fifth Third. See* 473 U.S. at 425. And *Jander* cut through Defendants' maze of speculative excuses by focusing on inevitability of the disclosure as "particularly important," since at that point "non-disclosure is no longer a realistic point of comparison." *Jander*, 910 F.3d at 630.

---

[5] This is consistent with a non-binding case Defendants cite – *Fentress v. Exxon Mobil Corp.* – where plaintiffs argued that investigations by the state and SEC made disclosure inevitable. 2019 U.S. Dist. LEXIS 16934, at *13 (S.D. Tex. Feb. 4, 2019). The court disagreed, reasoning that investigations "are often long and may not result in any charges against a company," and in fact "resulted in no charges within the class period." *Id.* at *13-14. *Fentrees* did not involve an insurer having to pay billions of dollars that it did not have to policyholders.

**D.      Defendants also breached duties not at issue in *Fifth Third* or *Jander*.**

Plaintiff's claim also asserts that Defendants breached fiduciary duties not at issue in *Fifth Third* and *Jander*, namely, their duty to correct prior false or misleading representations made directly to Plan participants about the value of the GE Stock Fund. In 2009, Defendants sent a notice directly to Plaintiff and Plan participants expressly denying any under reserving problem existed or that the stock was artificially inflated. *Id., ¶* 48. Defendants' unequivocal denial was a written representation by a fiduciary to Plan participants about the value of a Plan asset. Plaintiff alleges that Defendants breached their continuing duty to correct because, after investigating, they either did learn or would have learned that their prior communication was false or misleading.

A fiduciary's duty to investigate "arises when there is some reason to suspect that investing in company stock may be imprudent – that is, there must be something akin to a 'red flag' of misconduct." *Pugh v. Tribune Co.*, 521 F.3d 686, 700 (7th Cir. 2008). Plaintiff's Complaint identifies three such "red flags" that alone or in combination gave rise to a duty to investigate. One is the complaint certain participants served on Defendants with detailed allegations that the insurance liabilities were underfunded by at least $5 billion dollars. Compl., ¶¶ 46-47. A prudent fiduciary would investigate such allegations about the value of a Plan asset. *See Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir. 1997) ("Upon receiving an inquiry from a beneficiary, a plan administrator 'has a fiduciary obligation to respond promptly and adequately in a way that is not misleading.'"); *Quan v. Comput. Scis. Corp.*, 623 F.3d 870, 885 n.9 (9th Cir. 2010) ("'Not to investigate suspicions that one has with respect to the funding and maintenance of the plan constitutes a breach of [fiduciary] duty.'"). Two subsequent red flags are the resistance to the banker's advice to sell the insurance subsidiaries and the billions of dollars a GE subsidiary was inexplicably contributing to the insurance entities between 2009 and 2016. Defendants were aware of the contributions. *Id.* ¶¶ 75, 78. It is plausible that a prudent fiduciary in Defendants' position, particularly after certain participants raised concerns about these entities, would have investigated why entities reporting close to $2 billion of surplus

24

needed billions of dollars of additional capital, and why the banker's advice to sell the insurance entities was rebuffed. *See also id.,* ¶ 40 (pointing out how GE sold its other insurance businesses because "the capital needed to reserve against insurance liabilities was conservatively invested and offered a lower return on equity than other financial businesses.").

Had either Defendant complied with their duty to investigate, they would have discovered the underlying problem, that the value of the GE common stock was artificially inflated, and that their prior written communication to Plan participants was false or misleading.[6] *Id.,* ¶¶ 73, 132. A fiduciary's written representation "is ongoing" and subject to a duty to correct "if it in fact becomes misleading." *McAuley v. Int'l Bus. Mach. Corp.,* 165 F.3d 1038, 1046 (6th Cir. 1999). By doing nothing, Defendants breached their duty to promptly disclose the problem and correct their prior false or misleading representation to Plan participants about the value of the GE Stock Fund. *Id.* These additional issues both are relevant to the context-specific inquiry under *Fifth Third* and *Jander*[7] and form an independent basis for a claim of breach of fiduciary duties under ERISA.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated May 22, 2019                         **CRUEGER DICKINSON LLC**

 s/Charles J. Crueger
*By:* **Charles J. Crueger**
admitted *pro hac vice*

Erin K. Dickinson, admitted *pro hac vice*
Benjamin A. Kaplan, admitted *pro hac vice*

---

[6] Whether Defendants' statements are affirmative misrepresentations because false or misleading when made, even if believed true at the time, "are questions for the trier of fact" that cannot be resolved on a motion to dismiss. *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir. 1994).

[7] Whether Plaintiff has plausibly alleged that Defendants behaved imprudently by failing to act on "nonpublic information that was available to them" is a "context-sensitive" inquiry. *Jander*, 910 F.3d at 626.

4532 N. Oakland Avenue
Whitefish Bay, Wisconsin 53211
Tel. (414) 210-3868
*cjc@cruegerdickinson.com*
*ekd@cruegerdickinson.com*
*bak@cruegerdickinson.com*

**WAGSTAFF & CARTMELL, LLP**
Jonathan P. Kieffer, admitted *pro hac vice*
Tyler W. Hudson, admitted *pro hac vice*
Eric D. Barton, admitted *pro hac vice*
4740 Grand Avenue, Suite 300
Kansas City, Missouri  64112
Tel.: (816) 701-1100
*jpkieffer@wcllp.com*
*thudson@wcllp.com*
*ebarton@wcllp.com*

**SIMMONS HANLY CONROY LLC**
Mitchell M. Breit
112 Madison Avenue
New York, New York 10016
Tel.: (212) 784-6400
*mbreit@simmonsfirm.com*

*Attorneys for Plaintiff*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2019 this document was electronically served on all parties through the NextGen CM/ECF system.

s/Charles J. Crueger      
Charles J. Crueger
